David S. Casey, Jr., SBN 060768
*dcasey@cglaw.com*
Gayle M. Blatt, SBN 122048
*gmb@cglaw.com*
Jeremy Robinson, SBN 188325
*jrobinson@cglaw.com*
P. Camille Guerra, SBN 326546
camille@cglaw.com
Seth Barron, SBN 325459
*sbarron@cglaw.com*
David S. Casey III, SBN 325599
*caseyd@cglaw.com*
**CASEY GERRY SCHENK**
**FRANCAVILLA BLATT & PENFIELD,**
**LLP**
110 Laurel Street
San Diego, CA  92101
Telephone: (619) 238-1811
Facsimile: (619) 544-9232

*Attorneys for Plaintiffs*

Christopher D. Moon, SBN 246622
*chris@moonlawapc.com*
Kevin O. Moon, SBN 246792
*kevin@moonlawapc.com*
**MOON LAW APC**
600 West Broadway, Suite 700
San Diego, California 92101
Telephone: (619) 915-9432
Facsimile: (650) 542-8432

# UNITED STATES DISTRICT COURT - CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **Cindy Uyenoyama; Vanessa Rodriguez; Benito Guzman; William Braden; Norman Ganon; Crystal Robinson; Maxine Glenn; Mariano Lorenzo Macaisa; Gini Michelle Cox; Shelia Cauthen; April Bradley; Richard Schellhammer; Shon Reeves; Earl Kladke; David Conroe;** and **John Toda** on behalf of themselves and a class of all others similarly situated<br><br>Plaintiffs,<br><br>v.<br><br>**General Motors, LLC,**<br><br>Defendant. | CASE NO.<br><br>**CLASS ACTION COMPLAINT**<br><br><br><br><br><br><br><br><br><br><br><br><br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Cindy Uyenoyama; Vanessa Rodriguez; Benito Guzman;; William Braden; Norman Ganon; Crystal Robinson; Maxine Glenn; Mariano Lorenzo Macaisa; Gini Michelle Cox; Sheila Cauthen; April Bradley; Richard Schellhammer; Shon Reeves; Earl Kladke; David Conroe; and John Toda individually and on behalf of a class of persons similarly situated (the "Class") bring this class action against Defendant, General Motors, LLC ("General Motors" or "Defendant" or "GM" or the "Company") seeking equitable relief and damages as set forth below.

## NATURE OF THIS ACTION

1.    Cadillac is an iconic American automobile brand and a division of Defendant GM. GM not only touts Cadillac as "a leading luxury auto brand,"[1] but also claims it is an innovative one.[2]  In fact, GM's Cadillac brand asserts that "Innovation isn't just what we do; it's coded in our DNA. From inventing the electric starter to re-inventing how we drive, we will continue our 115-year journey to drive the world forward. And there's no end in sight."[3]

2.    In an apparent attempt to live up to Cadillac's self-proclaimed mantle of innovation, GM developed the "Cadillac User Experience" or "CUE," which GM described as "a very elegant in-vehicle hub of all the information and entertainment in your life."[4] Indeed, GM represented that the CUE's "full suite of infotainment, navigation, and communication tools . . . keeps you fully connected." [5]

---

[1] https://media.gm.com/media/us/en/gm/news.detail.html/content/Pages/news/us/en/2011/Oct/1012cadillac.html.
[2] https://www.cadillac.com/world-of-cadillac/craftsmanship; https://www.cadillac.com/world-of-cadillac/innovation.
[3] https://www.cadillac.com/world-of-cadillac/innovation
[4] https://media.gm.com/media/us/en/gm/news.detail.html/content/Pages/news/us/en/2011/Oct/1012cadillac.html
[5] Even more, according to Defendant, the CUE is "a comprehensive in-vehicle experience that merges intuitive design with auto industry-first controls and commands for information and entertainment data . . . . [and] which will transform personal transportation by simply and efficiently integrating luxury design and instinctive technology with unparalleled levels of customized in-vehicle connectivity."
https://media.gm.com/media/us/en/gm/news.detail.html/content/Pages/news/us/en/2011/Oct/1012cadillac.html

3.    GM boated of several industry firsts with the CUE, including, proximity sensing, haptic feedback, multi-touch hand gestures, natural speech recognition and a Linux operating system.



Plaintiff Cox's CUE screen.

4.    What GM failed to disclose was the CUE possesses an innate and serious defect (the "Defect") that causes it to spontaneously delaminate or "spider-web," rendering its self-proclaimed state-of-the-art technology useless. When this happens, the unit ceases to function properly.

5.    Even more concerning, the Defect poses a serious safety risk to drivers, who can become dangerously distracted.

6. GM has known about the Defect for years. But instead of fixing it, GM continued to sell new Cadillac vehicles with the defect to customers without disclosing it and has forced its customers to spend upwards of $1,500.00—if not more—to replace the CUE once the defect fully manifests.

7. Adding insult to injury, when a customer does bring in a vehicle for replacement of the CUE, GM replaces the broken CUE with the *same* defectively designed and manufactured product. Consequently, the defective replacement CUE will eventually suffer the same delamination and spider-webbing issues. In fact, Plaintiffs Robinson and Bradley have had multiple CUEs replaced.

## JURISDICTION

8. This Court has original jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because the proposed Class consists of 100 or more members; the amount in controversy exceeds $5,000,000, exclusive of costs and interest; and minimal diversity exists. This Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

## VENUE

9. Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District. In addition, Plaintiff Delta Uyenoyama purchased his 2013 Cadillac ATS in this District, and Defendant has marketed, advertised, sold, and leased the Class Vehicles within this District.

## PARTIES

**A. Plaintiffs**

**California Plaintiffs**

10. Plaintiff Vanessa Rodriguez is a resident of Fresno, California.

11. Ms. Rodriguez purchased a 2013 Cadillac ATS sedan from the Michael Cadillac dealership, which is a franchised and authorized Cadillac dealership located in Fresno, California.

12. Ms. Rodriguez still owns her vehicle. At the time of purchase, the vehicle's CUE touchscreen did not exhibit any cracks or spider-webbing, or any other manifestations of the Defect. Unknown to Ms. Rodriguez, at the time she purchased her vehicle, the CUE had the Defect. Defendant knew about the Defect at the time Ms. Rodriguez purchased the vehicle but did not disclose it to her. Ms. Rodriguez purchased her vehicle based on the reasonable, but mistaken, belief that her vehicle would be safe and reliable. Had Ms. Rodriguez known about the Defect, she would not have purchased the vehicle or would have paid less for it.

13. In or around October 2018, Ms. Rodriguez first noticed spider-webbing on the lower-left side of the CUE touchscreen.

14. Since Ms. Rodriguez first noticed the Defect, the spider-webbing has become worse and has covered more of the screen.

15. After first observing the spider-webbing, Ms. Rodriguez has experienced the following problems—sometimes on numerous occasions—as a result of the Defect:

- The CUE touchscreen was entirely unresponsive;
- The CUE was delayed in responding to commands;
- The navigation feature did not work; and
- The backup camera did not work.

16. On other occasions when Ms. Rodriguez's phone was paired to the CUE, the CUE touchscreen controls failed to operate properly. The State of California makes it illegal to talk on a cellphone without a hands-free device, the violation of which can be a fine of more than $150 for first-time offenders.

17. Because the CUE is the only way to select which air vents are used to supply air conditioning or heat, in some instances, Ms. Rodriguez was unable to select the desired vents.

18. In fact, the Defect and its many deleterious consequences have created unsafe driving conditions.

19.   Ms. Rodriguez has suffered an ascertainable loss as a result of Defendant's representations and omissions, breach of express and implied warranties, and violation of various consumer protection laws associated with the CUE, including but not limited to, paying more for the vehicle than it was worth, future attempted repairs, and the diminished value of her vehicle.

20.   Neither Defendant nor any of its agents, dealers, or other representatives informed Ms. Rodriguez of the existence of the Defect and/or the defective design prior to her purchase.

21.   **Plaintiff Benito Guzman** is a resident of Stockton, California.

22.   Plaintiff Guzman purchased a 2016 Cadillac SRX from the Kuni Cadillac Dealership, which is a franchised and authorized Cadillac dealership located in Sacramento, California.

23.   Mr. Guzman still owns his vehicle.  At the time of purchase, the vehicle's CUE touchscreen did not exhibit any cracks or spider-webbing, or any other manifestations of the Defect. Unknown to Mr. Guzman, at the time he purchased his vehicle, the CUE had the Defect. Defendant knew about the Defect at the time Mr. Guzman purchased the vehicle but did not disclose it to him. Mr. Guzman purchased his vehicle based on the reasonable, but mistaken, belief that his vehicle would be safe and reliable.  Had Mr. Guzman known about the Defect, he would not have purchased the vehicle or would have paid less for it.

24.   In or around January 2018, Mr. Guzman first noticed spider-webbing on the lower-right side of the CUE touchscreen.

25.   Since Mr. Guzman first noticed the Defect, the spider-webbing has become worse and has covered more of the screen.

26.   After first observing the spider-webbing, Mr. Guzman has experienced the following problems—sometimes on numerous occasions—as a result of the Defect:

- The CUE touchscreen was entirely unresponsive;

- The CUE was delayed in responding to commands;
- The navigation feature did not work; and
- The backup camera did not work.

27.  Because the CUE is the only way to select which air vents are used to supply air conditioning or heat, in some instances, Mr. Guzman was unable to select the desired vents.

28.  In fact, the Defect and its resulting manifestations have created unsafe driving conditions.

29.  Mr. Guzman has suffered an ascertainable loss as a result of Defendant's representations and omissions, breach of express and implied warranties, and violation of various consumer protection laws associated with the CUE, including but not limited to, paying more for the vehicle than it was worth, future attempted repairs, and the diminished value of his vehicle.

30.  Neither Defendant nor any of its agents, dealers, or other representatives informed Mr. Guzman of the existence of the Defect and/or the defective design prior to his purchase.

31.  **Plaintiff Cindy Uyenoyama** is a resident of San Gabriel, California.

32.  Plaintiff Uyenoyama purchased a 2013 Cadillac ATS from the Crestview Cadillac dealership, which is a franchised and authorized Cadillac dealership located in West Covina, California.

33.  Ms. Uyenoyama still owns her vehicle.  At the time of purchase, the vehicle's CUE touchscreen did not exhibit any cracks or spider-webbing, or any other manifestations of the Defect.  Unknown to Ms. Uyenoyama, at the time she purchased her vehicle, the CUE had the Defect. Defendant knew about the Defect at the time Ms. Uyenoyama purchased the vehicle but did not disclose it to her. Ms. Uyenoyama purchased her vehicle based on the reasonable, but mistaken, belief that her vehicle would be safe and reliable.  Had Ms. Uyenoyama known about the Defect, her would not have purchased the vehicle or would have paid less for it.

34.   In or around June 2019, Ms. Uyenoyama's CUE stopped responding and became inoperable.

35.   Before the CUE became inoperable, Ms. Uyenoyama experienced the following Problems—sometimes on numerous occasions—as a result of the Defect:

- The CUE touchscreen was entirely unresponsive;
- The CUE was delayed in responding to commands;
- The navigation feature did not work; and
- The backup camera did not work.

36.   Because the CUE is the only way to select which air vents are used to supply air conditioning or heat, in some instances, Ms. Uyenoyama was unable to select the desired vents.

37.   Ms. Uyenoyama specifically purchased the vehicle because of its rear-view camera.  However, the camera in her vehicle no longer works because of the Defect.

38.   In fact, the Defect and its many deleterious consequences have created unsafe driving conditions.

39.   Ms. Uyenoyama has suffered an ascertainable loss as a result of Defendant's representations and omissions, breach of express and implied warranties, and violation of various consumer protection laws associated with the CUE, including but not limited to, paying more for the vehicle than it was worth, future attempted repairs, and the diminished value of her vehicle.

40.   Neither Defendant nor any of its agents, dealers, or other representatives informed Ms. Uyenoyama of the existence of the Defect and/or the defective design prior to her purchase

**Florida Plaintiff**

41.   Plaintiff William Braden is a resident of Hudson, Florida.

42. Mr. Braden initially leased, then subsequently purchased, a 2014 Cadillac SRX from the Autonation Cadillac Port Richey, which is a franchised and authorized Cadillac dealership located in Port Richey, Florida.

43. Mr. Braden still owns his vehicle. At the time of purchase, the vehicle's CUE touchscreen did not exhibit any cracks or spider-webbing, or any other manifestations of the Defect. Unknown to Mr. Braden, at the time he purchased his vehicle, the CUE had the Defect. Defendant knew about the Defect at the time Mr. Braden purchased the vehicle but did not disclose it to him. Mr. Braden purchased his vehicle based on the reasonable, but mistaken, belief that his vehicle would be safe and reliable. Had Mr. Braden known about the Defect, he would not have purchased the vehicle or would have paid less for it.

44. In or around June 2018, Mr. Braden, first noticed spider-webbing on the lower-right side of the CUE touchscreen.

45. Since Mr. Braden first noticed the Defect, the spider-webbing has become worse and has covered more of the screen.

46. After first observing the spider-webbing, Mr. Braden has experienced the following problems—sometimes on numerous occasions—as a result of the Defect:

- The CUE touchscreen was entirely unresponsive;
- The CUE was delayed in responding to commands;
- The navigation feature did not work; and
- The backup camera did not work.

47. Because the CUE is the only way to select which air vents are used to supply air conditioning or heat, in some instances, Mr. Braden was unable to select the desired vents.

48. In fact, the Defect and its many deleterious consequences have created unsafe driving conditions.

49. Mr. Braden has suffered an ascertainable loss as a result Defendant's representations and omissions, breach of express and implied warranties, and violation

of various consumer protection laws associated with the CUE, including but not limited to, paying more for the vehicle than it was worth, future attempted repairs, and the diminished value of his vehicle.

50.   Neither Defendant nor any of its agents, dealers, or other representatives informed Mr. Braden of the existence of the Defect and/or the defective design prior to his purchase.

**Maine Plaintiff**

51.   Plaintiff Norman Gagnon is a resident of Lisbon, Maine.

52.   Mr. Gagnon purchased a 2014 Cadillac SRX from the Frank Galos Chevrolet Cadillac Dealership, which is a franchised and authorized Cadillac dealership located in Saco, Maine.

53.   Mr. Gagnon still owns his vehicle.  At the time of purchase, the vehicle's CUE touchscreen did not exhibit any cracks or spider-webbing, or any other manifestations of the Defect.  Unknown to Mr. Gagnon, at the time he purchased his vehicle, the CUE had the Defect.  Defendant knew about the Defect at the time Mr. Gagnon purchased the vehicle but did not disclose it to him.  Mr. Gagnon purchased his vehicle based on the reasonable, but mistaken, belief that his vehicle would be safe and reliable.  Had Mr. Gagnon known about the Defect, he would not have purchased the vehicle or would have paid less for it.

54.   In or around June 2019, Mr. Gagnon, first noticed spider-webbing on the lower-portion of the CUE touchscreen.

55.   Since Mr. Gagnon first noticed the Defect, the spider-webbing has become worse and has covered more of the screen.

56.   After first observing the spider-webbing, Mr. Gagnon has experienced the following problems—sometimes on numerous occasions—as a result of the Defect:

- The CUE touchscreen was entirely unresponsive;
- The CUE was delayed in responding to commands;

- The navigation feature did not work; and

- The backup camera did not work;

57.   Because the CUE is the only way to select which air vents are used to supply air conditioning or heat, in some instances, Mr. Gagnon was unable to select the desired vents.

58.   In fact, the Defect and its many deleterious consequences have created unsafe driving conditions.

59.   Starting on September 19, 2019, it will be illegal in Maine to talk on a cellphone without a hands-free device, the violation of which is a fine of not less than $50 for first-time offenders and not less than $250 for second-time offenders.

60.   Mr. Gagnon has suffered an ascertainable loss as a result of Defendant's representations and omissions, breach of express and implied warranties, and violation of various consumer protection laws associated with the CUE, including but not limited to, paying more for the vehicle than it was worth, future attempted repairs, and the diminished value of his vehicle.

61.   Neither Defendant nor any of its agents, dealers, or other representatives informed Mr. Gagnon of the existence of the Defect and/or the defective design prior to her purchase.

**Alabama Plaintiffs**

62.   Plaintiff Crystal Robinson is a resident of Birmingham, Alabama.

63.   Ms. Robinson purchased a 2014 Cadillac SRX from the Crest Cadillac, which is a franchised and authorized Cadillac dealership located in Birmingham, Alabama.

64.   Ms. Robinson still owns her vehicle.  At the time of purchase, the vehicle's CUE touchscreen did not exhibit any cracks or spider-webbing, or any other manifestations of the Defect.  Unknown to Ms. Robinson, at the time she purchased her vehicle, the CUE had the Defect.  Defendant knew about the Defect at the time Ms. Robinson purchased the vehicle but did not disclose it to her.  Ms. Robinson

purchased her vehicle based on the reasonable, but mistaken, belief that her vehicle would be safe and reliable. Had Ms. Robinson known about the Defect, she would not have purchased the vehicle or would have paid less for it.

65. In or Around November 2016, Ms. Robinson, first noticed spider-webbing on the CUE touchscreen.

66. Ms. Robinson brought the vehicle back to Crest Cadillac at this time to have them repair the CUE screen. Because the vehicle was still under the warranty, Cadillac replaced the defective CUE unit.

67. Roughly a year and half after Crest Cadillac replaced her CUE unit, Ms. Robinson again noticed spider-webbing on the upper-right side of the CUE touchscreen.

68. Ms. Robinson went back to Crest Cadillac again to have the CUE replaced. However, she was told the vehicle was not under warranty and this would not be covered. She was told it would cost over $1,000 to replace the unit.

69. Since Ms. Robinson first noticed the Defect, the spider-webbing has become worse and has covered more of the screen.

70. After first observing the spider-webbing, Ms. Robinson has experienced the following problems—sometimes on numerous occasions—as a result of the Defect:

- The CUE touchscreen was entirely unresponsive;
- The CUE was delayed in responding to commands;
- The navigation feature did not work;

71. Because Sirius XM was already programmed into the vehicle, Ms. Robinson can control 5-6 stations using the steering wheel. However, as a result of the Defect, Ms. Robinson is unable to listen to nearly all the remaining Sirius stations, and she is therefore not receiving the benefit of her bargain.

72.   Because the CUE is the only way to select which air vents are used to supply air conditioning or heat, in some instances, Ms. Robinson was unable to select the desired vents.

73.   In fact, the Defect and its many deleterious consequences have created unsafe driving conditions.

74.   Ms. Robinson has suffered an ascertainable loss as a result of Defendant's representations and omissions, breach of express and implied warranties, and violation of various consumer protection laws associated with the CUE, including but not limited to, paying more for the vehicle than it was worth, future attempted repairs, and the diminished value of her vehicle.

75.   Neither Defendant nor any of its agents, dealers, or other representatives informed Ms. Robinson of the existence of the Defect and/or the defective design prior to her purchase.

76.   **Plaintiff Richard Schellhammer** is a resident of Tuscaloosa, Alabama.

77.   Mr. Schellhammer purchased a 2014 Cadillac ATS from Barkley Cadillac, which is a franchised and authorized Cadillac dealership located in Tuscaloosa, Alabama.

78.   Mr. Schellhammer still owns his vehicle.  At the time of purchase, the vehicle's CUE touchscreen did not exhibit any cracks or spider-webbing, or any other manifestations of the Defect.  Unknown to Mr. Schellhammer, at the time he purchased his vehicle, the CUE had the Defect.  Defendant knew about the Defect at the time Mr. Schellhammer purchased the vehicle but did not disclose it to him.  Mr. Schellhammer purchased his vehicle based on the reasonable, but mistaken, belief that his vehicle would be safe and reliable.  Had Mr. Schellhammer known about the Defect, he would not have purchased the vehicle or would have paid less for it.

79.   In or around June 2018, Mr. Schellhammer, first noticed spider-webbing on the CUE touchscreen.

80.   Since Mr. Schellhammer first noticed the Defect, the spider-webbing has become worse and has covered more of the screen.

81.   After first observing the spider-webbing, Mr. Schellhammer has experienced the following problems—sometimes on numerous occasions—as a result of the Defect:

- The CUE touchscreen was entirely unresponsive;
- The CUE was delayed in responding to commands;
- The navigation feature did not work;
- The backup camera did not work;

82.   Mr. Schellhammer's CUE has now completely stopped responding to his touch and has become completely unusable.

83.   Because the CUE is the only way to select which air vents are used to supply air conditioning or heat, in some instances, Mr. Schellhammer is unable to select the desired vents.

84.   In fact, the Defect and its many deleterious consequences have created unsafe driving conditions.

85.   Plaintiff Schellhammer has suffered an ascertainable loss as a result of Defendant's representations and omissions, breach of express and implied warranties, and violation of various consumer protection laws associated with the CUE, including but not limited to, paying more for the vehicle than it was worth, future attempted repairs, and the diminished value of his vehicle.

86.   Neither Defendant nor any of its agents, dealers, or other representatives informed Plaintiff Schellhammer of the existence of the Defect and/or the defective design prior to his purchase.

**Maryland Plaintiff**

87.   Plaintiff Maxine Glenn is a resident of Waldorf, Maryland.

88.  Ms. Glenn purchased a 2016 Cadillac SRX from the Waldorf Chevrolet Cadillac, which is a franchised and authorized Cadillac dealership located in Waldorf, Maryland.

89.  Ms. Glenn still owns her vehicle.  At the time of purchase, the vehicle's CUE touchscreen did not exhibit any cracks or spider-webbing, or any other manifestations of the Defect.  Unknown to Ms. Glenn, at the time she purchased her vehicle, the CUE had the Defect. Defendant knew about the Defect at the time Ms. Glenn purchased the vehicle but did not disclose it to her. Ms. Glenn purchased her vehicle based on the reasonable, but mistaken, belief that her vehicle would be safe and reliable.  Had Ms. Glenn known about the Defect, she would not have purchased the vehicle or would have paid less for it.

90.  In or around April 2019, Ms. Glenn, first noticed spider-webbing on the CUE touchscreen.

91.  Since Ms. Glenn first noticed the defect, the spider-webbing has become worse and has covered more of the screen.

92.  After first observing the spider-webbing, Ms. Glenn has experienced the following problems—sometimes on numerous occasions—as a result of the Defect:

- The CUE touchscreen was entirely unresponsive;
- The CUE was delayed in responding to commands;
- The navigation feature did not work;
- The backup camera did not work;

93.  Because the CUE is the only way to select which air vents are used to supply air conditioning or heat, in some instances, Ms. Robinson was unable to select the desired vents.

94.  In fact, the Defect and its many deleterious consequences have created unsafe driving conditions.

95.  The State of Maryland makes it illegal to talk on a cellphone without a hands-free device, the violation of which can be a fine of $75 for first-time offenders.

96.   Ms. Glenn has suffered an ascertainable loss as a result of Defendant's representations and omissions, breach of express and implied warranties, and violation of various consumer protection laws associated with the CUE, including but not limited to, paying more for the vehicle than it was worth, future attempted repairs, and the diminished value of her vehicle.

97.   Neither Defendant nor any of its agents, dealers, or other representatives informed Ms. Glenn of the existence of the Defect and/or the defective design prior to her purchase.

**North Carolina Plaintiffs**

98.   Plaintiff Sheila Cauthen is a resident of Greensboro, North Carolina.

99.   Ms. Cauthen purchased a 2013 Cadillac SRX from the Hendrick Cadillac Southpoint, which is a franchised and authorized Cadillac dealership located in Durham, North Carolina.

100. Ms. Cauthen still owns her vehicle. At the time of purchase, the vehicle's CUE touchscreen did not exhibit any cracks or spider-webbing, or any other manifestations of the Defect. Unknown to Ms. Cauthen, at the time he purchased her vehicle, the CUE had the Defect.  Defendant knew about the Defect at the time Ms. Cauthen purchased the vehicle but did not disclose it to her. Ms. Cauthen purchased her vehicle based on the reasonable, but mistaken, belief that her vehicle would be safe and reliable. Had Ms. Cauthen known about the Defect, she would not have purchased the vehicle or would have paid less for it.

101. In or around May 2019, Ms. Cauthen, first noticed spider-webbing on the lower-portion of the CUE touchscreen.

102. Since Ms. Cauthen first noticed the Defect, the spider-webbing has become worse and has covered more of the screen.

103.  After first observing the spider-webbing, Ms. Cauthen has experienced the following problems—sometimes on numerous occasions—as a result of the Defect:

- The CUE touchscreen was entirely unresponsive;
- The CUE was delayed in responding to commands;
- The navigation feature did not work;
- The backup camera did not work;

104. Because the CUE is the only way to select which air vents are used to supply air conditioning or heat, in some instances, Ms. Cauthen was unable to select the desired vents.

105. In fact, the Defect and its many deleterious consequences have created unsafe driving conditions.

106. Ms. Cauthen has suffered an ascertainable loss as a result of Defendant's representations and omissions, breach of express and implied warranties, and violation of various consumer protection laws associated with the CUE, including but not limited to, paying more for the vehicle than it was worth, future attempted repairs, and the diminished value of her vehicle.

107. Neither Defendant nor any of its agents, dealers, or other representatives informed Ms. Cauthen of the existence of the Defect and/or the defective design prior to her purchase.

108. **Plaintiff Mariano Lorenzo Macaisa** is a resident of Raleigh, North Carolina.

109. Mr. Macaisa purchased a 2013 Cadillac ATS from Auction Direct USA located in Raleigh, North Carolina.

110. Mr. Macaisa still owns his vehicle. At the time of purchase, the vehicle's CUE touchscreen did not exhibit any cracks or spider-webbing, or any other manifestations of the Defect. Unknown to Mr. Macaisa, at the time he purchased his vehicle, the CUE had the Defect. Defendant knew about the Defect at the time Mr. Macaisa purchased the vehicle but did not disclose it to him.  Mr. Macaisa purchased his vehicle based on the reasonable, but mistaken, belief that his vehicle would be safe

and reliable. Had Mr. Macaisa known about the Defect, he would not have purchased the vehicle or would have paid less for it.

111. In or around June 2019, Mr. Macaisa, first noticed spider-webbing on the CUE touchscreen.

112. Since Mr. Macaisa first noticed the Defect, the spider-webbing has become worse and has covered more of the screen.

113.  After first observing the spider-webbing, Mr. Macaisa has experienced the following problems—sometimes on numerous occasions—as a result of the Defect:

- The CUE touchscreen was entirely unresponsive;
- The CUE was delayed in responding to commands;
- The navigation feature did not work;
- The backup camera did not work;

114. Mr. Macaisa's CUE has now completely stopped responding to his touch and has become entirely unusable.

115. Because the CUE is the only way to select which air vents are used to supply air conditioning or heat, Mr. Macaisa is unable to select the desired vents.

116. In fact, the Defect and its many deleterious consequences have created unsafe driving conditions.

117. Mr. Macaisa has suffered an ascertainable loss as a result of Defendant's representations and omissions, breach of express and implied warranties, and violation of various consumer protection laws associated with the CUE, including but not limited to, paying more for the vehicle than it was worth, future attempted repairs, and the diminished value of his vehicle.

118. Neither Defendant nor any of its agents, dealers, or other representatives informed Mr. Macaisa of the existence of the Defect and/or the defective design prior to his purchase.

**Texas Plaintiff**

119. Plaintiff Gini Michelle Cox is a resident of Midland, Texas.

120. Ms. Cox purchased a 2013 Cadillac ATS sedan from the Midland Cadillac, which is a franchised and authorized Cadillac dealership located in Midland, Texas.

121. Ms. Cox still owns her vehicle. At the time of purchase, the vehicle's CUE touchscreen did not exhibit any cracks or spider-webbing, or any other manifestations of the Defect. Unknown to Ms. Cox, at the time he purchased her vehicle, the CUE had the Defect. Defendant knew about the Defect at the time Ms. Cox purchased the vehicle but did not disclose it to her. Ms. Cox purchased her vehicle based on the reasonable, but mistaken, belief that her vehicle would be safe and reliable. Had Ms. Cox known about the Defect, she would not have purchased the vehicle or would have paid less for it.

122. In or around November 2018, Ms. Cox, first noticed spider-webbing on the lower-left side of the CUE touchscreen.

123. Since Ms. Cox first noticed the Defect, the spider-webbing has become worse and has covered more of the screen.

124. After first observing the spider-webbing, Ms. Cox has experienced the following problems—sometimes on numerous occasions—as a result of the Defect:

- The CUE touchscreen was entirely unresponsive;
- The CUE was delayed in responding to commands;
- The navigation feature did not work;
- The backup camera did not work;

125. Because the CUE is the only way to select which air vents are used to supply air conditioning or heat, in some instances, Ms. Cox was unable to select the desired vents.

126. In fact, the Defect and its many deleterious consequences have created unsafe driving conditions.

127. Ms. Cox has suffered an ascertainable loss as a result of Defendant's representations and omissions, breach of express and implied warranties, and violation of various consumer protection laws associated with the CUE, including but not limited to, paying more for the vehicle than it was worth, future attempted repairs, and the diminished value of her vehicle.

128. Neither Defendant nor any of its agents, dealers, or other representatives informed Ms. Cox of the existence of the Defect and/or the defective design prior to her purchase.

**Indiana Plaintiff**

129. Plaintiff April Bradley is a resident of Bloomington, Indiana.

130. Ms. Bradley purchased a 2013 Cadillac SRX from Curry Buick Cadillac, which is a franchised and authorized Cadillac dealership located in Bloomington, Indiana.

131. Ms. Bradley still owns her vehicle.  At the time of purchase, the vehicle's CUE touchscreen did not exhibit any cracks or spider-webbing, or any other manifestations of the Defect.  Unknown to Ms. Bradley, at the time she purchased her vehicle, the CUE had the Defect.  Defendant knew about the Defect at the time Ms. Bradley purchased the vehicle but did not disclose it to her.  Ms. Bradley purchased her vehicle based on the reasonable, but mistaken, belief that her vehicle would be safe and reliable.  Had Ms. Bradley known about the Defect, she would not have purchased the vehicle or would have paid less for it.

132. In or around April 2019, Ms. Bradley, first noticed spider-webbing on the lower-portion of the CUE touchscreen.

133. Since Ms. Bradley first noticed the Defect, the spider-webbing has become worse and has covered more of the screen.

134.  After first observing the spider-webbing, Ms. Bradley has experienced the following problems—sometimes on numerous occasions—as a result of the Defect:

- The CUE touchscreen was entirely unresponsive;
- The CUE was delayed in responding to commands;
- The navigation feature did not work;
- The backup camera did not work;

135. Because the CUE is the only way to select which air vents are used to supply air conditioning or heat, in some instances, Ms. Bradley was unable to select the desired vents.

136. In fact, the Defect and its many deleterious consequences have created unsafe driving conditions.

137. This is not the first time Ms. Bradley has experienced the Defect. On a prior occasion, the CUE in her vehicle spider-webbed and was replaced under warranty. However, after the current CUE in her vehicle spider-webbed, Ms. Bradley complained to the dealership and Defendant. After much back and forth, Defendant agreed to cover some of the cost of the replacement CUE, yet Ms. Bradley still had to pay $162 to replace the CUE.

138. Ms. Bradley has suffered an ascertainable loss as a result of Defendant's representations and omissions, breach of express and implied warranties, and violation of various consumer protection laws associated with the CUE, including but not limited to, paying more for the vehicle than it was worth, future attempted repairs, and the diminished value of her vehicle.

139. Neither Defendant nor any of its agents, dealers, or other representatives informed Ms. Bradley of the existence of the Defect and/or the defective design prior to her purchase.

**Iowa Plaintiff**

140. Plaintiff Shon Reeves is a resident of Adel, Iowa.

141. Mr. Reeves purchased a 2013 Cadillac XTS from the Cole Chevrolet located in Pocatello, Idaho.

142. Mr. Reeves still owns his vehicle.  At the time of purchase, the vehicle's CUE touchscreen did not exhibit any cracks or spider-webbing, or any other manifestations of the Defect.  Unknown to Mr. Reeves, at the time he purchased his vehicle, the CUE had the Defect.  Defendant knew about the Defect at the time Mr. Reeves purchased the vehicle but did not disclose it to him.  Mr. Reeves purchased his vehicle based on the reasonable, but mistaken, belief that his vehicle would be safe and reliable.  Had Mr. Reeves known about the Defect, he would not have purchased the vehicle or would have paid less for it.

143. In or around June 2019, Mr. Reeves, first noticed spider-webbing on the lower-portion of the CUE touchscreen.

144. Since Mr. Reeves first noticed the Defect, the spider-webbing has become worse and has covered more of the screen.

145. After first observing the spider-webbing, Mr. Reeves has experienced the following problems—sometimes on numerous occasions—as a result of the Defect:

- The CUE touchscreen was entirely unresponsive;
- The CUE was delayed in responding to commands;
- The navigation feature did not work;
- The backup camera did not work;

146. Because the CUE is the only way to select which air vents are used to supply air conditioning or heat, in some instances, Mr. Reeves was unable to select the desired vents.

147. In fact, the Defect and its many deleterious consequences have created unsafe driving conditions.

148. Mr. Reeves has suffered an ascertainable loss as a result of Defendant's representations and omissions, breach of express and implied warranties, and violation of various consumer protection laws associated with the CUE, including but not limited to, paying more for the vehicle than it was worth, future attempted repairs, and the diminished value of his vehicle.

149. Neither Defendant nor any of its agents, dealers, or other representatives informed Mr. Reeves of the existence of the Defect and/or the defective design prior to his purchase.

**New York Plaintiff**

150. Plaintiff Earl Kladke is a resident of Lakeview, New York.

151. Mr. Kladke purchased a 2016 Cadillac SRX from Plaza Cadillac, which is a franchised and authorized Cadillac dealership located in Leesburg, Florida.

152. Mr. Kladke still owns his vehicle.  At the time of purchase, the vehicle's CUE touchscreen did not exhibit any cracks or spider-webbing, or any other manifestations of the Defect.  Unknown to Mr. Kladke, at the time he purchased his vehicle, the CUE had the Defect.  Defendant knew about the Defect at the time Mr. Kladke purchased the vehicle but did not disclose it to him.  Mr. Kladke purchased his vehicle based on the reasonable, but mistaken, belief that his vehicle would be safe and reliable.  Had Mr. Kladke known about the Defect, he would not have purchased the vehicle or would have paid less for it.

153. In or around May 2019, Mr. Kladke, first noticed spider-webbing on the lower-portion of the CUE touchscreen.

154. Since Mr. Kladke first noticed the Defect, the spider-webbing has become worse and has covered more of the screen.

155.  After first observing the spider-webbing, Mr. Kladke has experienced the following problems—sometimes on numerous occasions—as a result of the CUE Defect:

- The CUE touchscreen was entirely unresponsive;
- The CUE was delayed in responding to commands;
- The navigation feature did not work;
- The backup camera did not work;

156. Because the CUE is the only way to select which air vents are used to supply air conditioning or heat, in some instances, Mr. Kladke was unable to select the desired vents.

157. In fact, the Defect and its many deleterious consequences have created unsafe driving conditions.

158. The State of New York makes it illegal to talk on a cellphone without a hands-free device, the violation of which can be a fine of $200 for first-time offenders.

159. Mr. Kladke has suffered an ascertainable loss as a result of Defendant's representations and omissions, breach of express and implied warranties, and violation of various consumer protection laws associated with the CUE, including but not limited to, paying more for the vehicle than it was worth, future attempted repairs, and the diminished value of his vehicle.

160. Neither Defendant nor any of its agents, dealers, or other representatives informed Mr. Kladke of the existence of the Defect and/or the defective design prior to his purchase.

**West Virginia Plaintiff**

161. Plaintiff David Conroe is a resident of Bunker Hill, West Virginia.

162. Mr. Conroe purchased a 2013 Cadillac XTS from Opequon Motors which is a franchised and authorized Cadillac dealership located in Martinsburg, West Virginia.

163. Mr. Conroe still owns his vehicle. At the time of purchase, the vehicle's CUE touchscreen did not exhibit any cracks or spider-webbing, or any other manifestations of the Defect. Unknown to Mr. Conroe, at the time he purchased his vehicle, the CUE had the Defect. Defendant knew about the Defect at the time Mr. Conroe purchased the vehicle but did not disclose it to him. Mr. Conroe purchased his vehicle based on the reasonable, but mistaken, belief that his vehicle would be safe and reliable. Had Mr. Conroe known about the Defect, he would not have purchased the vehicle or would have paid less for it.

164. In or around May 2019, Mr. Conroe, first noticed spider-webbing on the lower-portion of the CUE touchscreen.

165. Since Mr. Conroe first noticed the Defect, the spider-webbing has become worse and has covered more of the screen.

166. After first observing the spider-webbing, Mr. Conroe has experienced the following problems—sometimes on numerous occasions—as a result of the Defect:

- The CUE touchscreen was entirely unresponsive;
- The CUE was delayed in responding to commands;
- The navigation feature did not work;
- The backup camera did not work and was obscured by the spider-webbing;

167. Because the CUE is the only way to select which air vents are used to supply air conditioning or heat, in some instances, Mr. Conroe was unable to select the desired vents.

168. In fact, the Defect and its many deleterious consequences have created unsafe driving conditions.

169. The State of West Virginia makes it illegal to talk on a cellphone without a hands-free device, the violation of which can be a fine of $100 for first-time offenders.

170. Mr. Conroe has suffered an ascertainable loss as a result of Defendant's representations and omissions, breach of express and implied warranties, and violation of various consumer protection laws associated with the CUE, including but not limited to, paying more for the vehicle than it was worth, future attempted repairs, and the diminished value of his vehicle.

171. Neither Defendant nor any of its agents, dealers, or other representatives informed Mr. Conroe of the existence of the Defect and/or the defective design prior to his purchase.

**Kansas Plaintiff**

172. Plaintiff John Toda is a resident of Tecumseh, Kansas.

173. Mr. Toda purchased a 2014 Cadillac ATS from the Doug Richter Cadillac Dealership, which is a franchised and authorized Cadillac dealership located in Topeka, Kansas.

174. Mr. Toda still owns his vehicle.  At the time of purchase, the vehicle's CUE touchscreen did not exhibit any cracks or spider-webbing, or any other manifestations of the Defect.  Unknown to Mr. Toda, at the time he purchased his vehicle, the CUE had the Defect.  Defendant knew about the Defect at the time Mr. Toda purchased the vehicle but did not disclose it to him.  Mr. Toda purchased his vehicle based on the reasonable, but mistaken, belief that his vehicle would be safe and reliable.  Had Mr. Toda known about the Defect, he would not have purchased the vehicle or would have paid less for it.

175. In or around February 2019, Mr. Toda, first noticed spider-webbing on the lower-portion of the CUE touchscreen.

176. Since Mr. Toda first noticed the Defect, the spider-webbing has become worse and has covered more of the screen.

177.  After first observing the spider-webbing, Mr. Toda has experienced the following problems—sometimes on numerous occasions—as a result of the Defect:

- The CUE touchscreen was entirely unresponsive;
- The CUE was delayed in responding to commands;
- The navigation feature did not work; and
- The backup camera did not work;

178. Because the CUE is the only way to select which air vents are used to supply air conditioning or heat, in some instances, Mr. Toda was unable to select the desired vents.

179. In fact, the Defect and its many deleterious consequences have created unsafe driving conditions.

180. Mr. Toda has suffered an ascertainable loss as a result of Defendant's representations and omissions, breach of express and implied warranties, and violation of various consumer protection laws associated with the CUE, including but not limited to, paying more for the vehicle than it was worth, future attempted repairs, and the diminished value of his vehicle.

181. Neither Defendant nor any of its agents, dealers, or other representatives informed Mr. Toda of the existence of the Defect and/or the defective design prior to his purchase.

**B. Defendant**

182. Defendant General Motors Company is a corporation doing business in all 50 states (including the District of Columbia) and is organized under the laws of the State of Delaware, with its principal place of business in Detroit, Michigan. At all times relevant to this action, Defendant manufactured, sold, leased, and warranted the Class Vehicles at issue under the Cadillac brand name throughout the United States. Defendant and/or its agents designed, manufactured, and installed the defective CUEs in the Class Vehicles. Defendant also developed and disseminated the owner's manuals and warranty booklets, advertisements, and other promotional materials relating to the Class Vehicles.

## **TOLLING OF THE STATUTE OF LIMITATIONS**

183. Any applicable statutes of limitations have been tolled by Defendant's knowing and active concealment and denial of the facts alleged herein. Plaintiffs and the other Class members could not have reasonably discovered the true, latent defective nature of the CUE until shortly before this class-action litigation was commenced.

184. Plaintiffs and Class Members did not discover, and could not have discovered with reasonable diligence, Defendants' deceit regarding the defects alleged herein.

185.  Plaintiff and Class Members could have only discovered the defect if they experienced the Defect. Plaintiff and Class Members had no reason to discover the Defect. Even if they did experience the Defect, Plaintiff and Class Members would have no reason to discover the existence of a widespread defect and the effort to hide it.

186.  Defendant was and remains under a continuing duty to disclose to Plaintiffs and the other Class members the true character, quality, and nature of the Class Vehicles, that the Defect is a result of Defendant's design choices, and that it will require costly repairs, and diminishes the resale value of the Class Vehicles.  As a result of the active concealment by Defendant, any and all statutes of limitations otherwise applicable to the allegations herein have been tolled.

## FACTUAL ALLEGATIONS

**A. The CUE**

187. "In-Vehicle Infotainment" or "Infotainment" is an automobile industry term that refers to vehicle systems that combine entertainment and information delivery to drivers.  Infotainment systems use audio/video interfaces, touchscreens, keypads, and other types of devices to provide those services.



188. The CUE is Cadillac's Infotainment System.

189. The CUE is integrated into the top of the vehicle's central instrument panel, and includes a touch screen assembly or module, which permits a driver to use

Class Action Complaint

the CUE's various functions by touching the screen.

190. In this regard, the touch screen is the gateway between the user and the vehicle's safety, navigation, communications, and entertainment features.

191. The CUE's touch screen "Home Page" has icons that depict the CUE's various features, which can be accessed by pressing the desired icon on the touch screen.



192. The CUE includes the following features:

- <u>Voice Recognition</u>:  By pressing the "Voice Recognition" icon on the touchscreen display, voice recognition allows for "hands-free" operation within the navigation, audio, phone, and weather applications.

- <u>Audio</u>:  By pressing the "Audio" icon on the CUE touchscreen display, a user can access different audio sources, including AM and

FM radio, and SiriusXM Satellite Radio (if equipped), CD and MP3 player, USB/SD ports[6], Bluetooth[7] and an auxiliary input.

- <u>Phone</u>: By pressing the "Phone" icon on the CUE touchscreen display, a user can access certain features of his or her cellular phone if it is paired to the CUE through Bluetooth.  For example, a user can place and receive calls in a "hands-free" mode using the CUE's voice-recognition system.  In addition, a user can share his or her phone contact list and address book with the CUE.

- <u>Navigation</u>:  By pressing the "NAV" icon on the CUE touchscreen, a user can access maps, driving directions, routing preferences, current location, places of interest, traffic updates, an estimated arrival time, and other features.

- <u>Climate</u>:  By pressing the "Climate" icon on the CUE touchscreen, a user can control the air temperature, including air conditioning, as well as mode settings that change air flow and direction (that is, through which air vents the air travels).

- <u>Rear Vision Camera (or Backup Camera)</u>:  The Rear Vision Camera is a safety feature that allows drivers, whenever the vehicle is placed in Reverse, to see the area behind the vehicle by displaying that area on the CUE touchscreen.  The National Highway Transportation Safety

---

[6] "USB" is the abbreviation for "Universal Serial Bus" and "SD" stands for "Secure Digital."  The USB/SD ports allow personal or peripheral devices to be connected to the CUE.  *See* https://en.wikipedia.org/wiki/USB and https://en.wikipedia.org/wiki/SD_card#SDXC.

[7] Bluetooth is a wireless technology standard for exchanging data over short distances using short-wavelength UHF radio waves in the ISM band from 2.400 to 2.485 GHz from fixed and mobile devices and building personal area networks (PANs).  *See* https://en.wikipedia.org/wiki/Bluetooth.  A Bluetooth equipped device, such as a cellular phone, can be paired with (or connected to) the CUE using the Bluetooth technology.

Administration ("NHTSA") has reported that backup cameras could prevent half of the deaths caused by backover accidents.[8]

193. The CUE debuted in 2012 (model year 2013) in Cadillac models XTS, ATS, and SRX. The CUE was then included in other models as they were introduced or refreshed. The following chart depicts the Cadillac models ("Class Vehicles") that contain the CUE at issue:

| Brand: | Model: | Model Years: |
|--------|--------|--------------|
| Cadillac | ATS | 2013 - 2017 |
| Cadillac | SRX | 2013 - 2017 |
| Cadillac | XTS | 2013 - 2017 |
| Cadillac | CTS Vin A | 2014 - 2017 |
| Cadillac | ELR | 2014 - 2017 |
| Cadillac | Escalade | 2014 - 2017 |

**A.      Defendant Promoted the CUE's Safety Features**

194. Cadillac advertised the CUE as improving driver safety. For example, Cadillac claimed "CUE doesn't replace your smartphone or your iPod. Rather it allows consumers to securely store those mobile devices while channeling the information on those devices, along with your navigation tools, weather maps with Doppler radar, AM/FM and XM radio, instant messages and emails, through a central portal in your Cadillac, keeping hands on the wheel and eyes on the road."[9]

---

[8] https://www.autonews.com/article/20130620/OEM11/130629981/backup-camera-rule-for-cars-in-u-s-pushed-back-to-2015#axzz2iafFMKVW.

[9] https://media.gm.com/media/us/en/gm/news.detail.html/content/Pages/news/us/en/2011/Oct/1012cadillac.html (internal citation and quotation marks omitted).

195. Similarly, Cadillac touted: "Most navigation systems prompt users to insert destination information by separately inputting state, city, street, and house number information.  CUE users can manually or verbally input the entire destination address on one screen, saving time and keeping drivers focused on the road."[10]

196. Further, "[CUE] also incorporates natural language voice recognition, which allows customers to safely place calls, enter destinations, browse media, play music and control other functions simply by telling the vehicle what to do."[11]

**B.    The Defect**

197. The touch screen module or assembly is made up of two major components.

198. The first component is a projected capacitance touch screen comprised of a glass sheet with electrode patterns on both sides.  These electrode patterns hold an electrical charge.  A user touching the screen changes the amount of charge at the point of contact, permitting the touch point to be determined by circuits.

199. The second component is a plastic cover with channels.  The plastic cover sits in front of the projected capacitance touch screen and is the physical screen a user touches.

200. Sandwiched in between the plastic cover and the touch screen glass is a silicone-like material.

201. The CUE touch screen is defective in that the plastic cover is prone to delaminating or separating from the touch screen glass.  When this happens, the silicone-like material coalesces and forms a spider-web-like pattern on the display, which breaks the underlying circuit and prevents a user's touch from being registered. This, in turn, prevents a user from being able to access the CUE's various features.

---

[10]https://media.gm.com/media/us/en/cadillac/news.detail.html/content/Pages/news/us/en/2013/Mar/0321CadillacCUE.html.
[11]https://media.gm.com/media/us/en/gm/autoshows/new_york.detail.html/content/Pages/news/us/en/2013/Mar/nyas/26mar-cadillac/0326-cadillac-cts-design.html.



202. The Defect that causes the plastic cover and touch screen glass to separate can occur as a result of either mechanical stress or thermal stress—both of which are commonly experienced during normal operation of a vehicle.

**a. Mechanical Stress Failure**

203. Mechanical stress occurs as a result of the typical vibration and shaking a vehicle experiences during operation.   Because of the Defect, this standard mechanical stress can cause the plastic cover to separate from the touch screen, rendering the CUE inoperable.

204. The CUE was defectively designed because the placement of the screws and rubberized gasket allow the plastic cover to become separated from the frame of the CUE.  When this occurs, the silicone-like material under the plastic cover will

spider-web and crack.

205. The CUE has a total of 8 screws that hold the plastic cover to the touch screen. Six of the eight screws are located at the top of the screen, and only two screws are placed at the bottom.   As a result, the top portion of the plastic cover is firmly attached to the touch screen.



206. In contrast, there are only two screws on the bottom portion of the plastic cover, which causes it to flex and move when pressure is applied. The figure below shows the space between the metal frame and the plastic cover.  When the plastic cover is flexed or moved it will eventually spider-web and cause the unit to fail.

207. The placement of the screws is a defective design, as it allows too much movement to occur.  This, in turn, renders the plastic cover prone to separating from the touch screen glass.  When this happens, the silicone-like material forms a spider-web-like pattern on the display, which breaks the underlying circuit and prevent a user's touch from being registered.

1

2

3

4

5

6

7

8

9

10



11

12    208. Another contributing factor to the mechanical failures is the inadequate

13 rubber gasket.  The way the gasket is cut allows for a gap between the touch screen

14 and the plastic cover, which prevents a user's inputs from being registered by the

15 touch screen.  This gap also allows for more flexibility in the plastic cover, which

16 leads to the spider-webbing defect.

17

18

19

20

21

22

23

24

25

26

27

28



### b.  Thermal Stress Failure

209. The second failure scenario is where the plastic cover delaminates or separates due to temperature fluctuations.

210. Specifically, the touch screen assembly is made up of materials with different thermal expansion coefficients (e.g., a glass touch screen and a plastic cover).  Upon heating or cooling, thermal expansion mismatches can cause delamination between the plastic cover and the touch screen glass.

211. One common source of these thermal fluctuations are weather conditions. Hot weather can cause a vehicle's interior to become hot—much hotter, in fact, than what is experienced outside of the vehicle.  As a result, the various components in the vehicle need to be able to withstand hot temperatures.

212. The Automotive Electronics Council ("AEC") was originally established by Chrysler, Ford, and GM to establish common part-qualification and quality-system standards.  The AEC guidelines for component parts used in automotive applications depicted below.   Pursuant to the AEC guidelines, at a minimum, the CUE must be able to withstand a temperature of 85-degrees Celsius.

| GRADE | TEMPERATURE RANGE | | PASSIVE COMPONENT TYPE Maximum capability unless otherwise specified and qualified | TYPICAL/EXAMPLE APPLICATION |
|---|---|---|---|---|
| | MINIMUM | MAXIMUM | | |
| 0 | -50°C | +150°C | Flat chip ceramic resistors, X8R ceramic capacitors | All automotive |
| 1 | -40°C | +125°C | Capacitor Networks, Resistors, Inductors, Transformers, Thermistors, Resonators, Crystals and Varistors, all other ceramic and tantalum capacitors | Most underhood |
| 2 | -40°C | +105°C | Aluminum Electrolytic capacitors | Passenger compartment hot spots |
| 3 | -40°C | +85°C | Film capacitors, Ferrites, R/R-C Networks and Trimmer capacitors | Most passenger compartment |
| 4 | 0°C | +70°C | | Non-automotive |

213. However, because of the Defect, the CUE can experience delamination and spider-webbing—and is therefore rendered inoperable—when exposed to a temperature of 85-degrees Celsius.   As a result, the CUE fails to satisfy Defendant's own established minimum standards.

214. In addition, once the delamination occurs, it will worsen when exposed to even lower temperatures.

C. **The Defect Poses a Safety Risk and Causes Unsafe Driving**

215. As described below, the Defect can cause a driver to become distracted, as well as can impair or render useless many of the CUE's safety features.

216. For example, once the Defect has manifested, a driver is often unable to pair an electronic device to the CUE via Bluetooth because the CUE touchscreen becomes unresponsive to touch, and the driver is unable to navigate to the proper menu to pair the device.

217. In addition, even if a cellular phone had been previously paired to the CUE prior to the Defect manifesting, a driver may still be unable to answer calls through the touchscreen or to make calls using the touchscreen.

218. Further, the Defect may cause the navigation system to become inoperable.  For example, when the Defect causes the touchscreen to fail, a driver is unable to enter a desired destination into the navigation system using the touchscreen.

219. Moreover, the spider-webbing that results from the Defect may also substantially obscure the CUE display, which, in turn, distorts or masks the backup camera's images, rendering the camera unusable.  A backup camera is a NHTSA recommend safety device in all cars.[12]

220. In 2017, distracted driving killed 3,166 people.[13]

---

[12] https://www.nhtsa.gov/equipment/driver-assistance-technologies#backing-parking-30656 (last visited August 17, 2019.)

[13] U Drive. U Text. U Pay. NHTSA, https://www.nhtsa.gov/risky-driving/distracted-driving  (last visited Aug 19, 2019)

221. According to the Centers for Disease Control, there are three types of distracted driving: (1) Visual (i.e., taking your eyes off the road); (2) Cognitive (i.e., thinking about something other than driving); and (3) Manual (i.e., physically taking your hands off of the steering wheel).[14]

222. The Defect causes drivers to experience all three types of distraction: (1) drivers are unable to read or see the screen properly, thereby causing them to divert their eyes from the road longer than under normal conditions; (2) drivers become focused on, and frustrated by, the Defect and its various manifestations while driving; and (3) when the touchscreen works intermittently or inconsistently, for example, drivers must remove their hands from the steering wheel in many more instances than those in which the CUE functions properly.

**D.   Defendant Has Been Aware of the Defect Since at Least 2014**

**1.   Beginning in 2014, Defendant Issued Multiple Technical Service Bulletins Describing the Defect**

223. A technical service bulletin or "TSB" is a document that is issued by a vehicle manufacturer describing a problem with a vehicle and recommending procedures for remedying the problem.

224. TSBs are generally issued by a vehicle manufacturer to dealership service departments and mechanics.

225. Regarding is own Technical Service Bulletins, Defendant has stated, "GM bulletins are intended for use by professional technicians, NOT a 'do-it-yourselfer". They are written to inform these technicians of conditions that may occur on some vehicles[.]"[15]

**PIC6055**

226. In December 2014, Defendant issued a TSB titled "Bulletin No.:

---

[14] Distracted Driving | Motor Vehicle Safety | CDC Injury Center Centers for Disease Control and Prevention, https://www.cdc.gov/motorvehiclesafety/Distracted_Driving/index.html  (last visited Aug 15, 2019)
[15] *See* Exhibit A [TSB PIC 6055]

PIC6055" ("6055").[16]  The subject of 6055 was "Integrated Center Stack Display
Delaminating Distorted or Appears Cracked Behind Lens."[17]  6055 further stated that
"[s]ome customers may report that their radio screen appears bubbled, cracked, or is
delaminating."[18]

227. Defendant included in 6055 a photograph clearly depicting the defect:



228. To remedy this issue, Defendant recommended "replac[ing] the ICS
(Integrated Center Stack) by following the SI replacement procedure."[19]

229. In addition, Defendant identified in 6055 the following models affected
by the defect:

- Cadillac ATS (model years 2013-2014)
- Cadillac SRX (model years 2013-2014)
- Cadillac XTS (model years 2013-2014)
- Cadillac CTS Vin A (model year 2014)

---

[16] *Id.*
[17] Id.
[18] *Id.*
[19] Id.

- Cadillac ELR (model year 2014)

**PIC6055A**

230. Less than 6 months after issuing 6055, in April 2015, Defendant issued another Technical Service Bulletin, which was titled "Bulletin No.: PIC6055A" ("6055A").[20]

231. 6055A was nearly identical to 6055, but it contained an expanded list of the Cadillac models affected by the defect:

- Cadillac ATS (model years 2013-2015)
- Cadillac SRX (model years 2013-2015)
- Cadillac XTS (model years 2013-2015)
- Cadillac CTS Vin A (model years 2014-2015)
- Cadillac ELR (model years 2014-2015)

**PIC6055B**

232. In October 2016, Defendant issued yet another Technical Service Bulletin describing the defect, titled "Bulletin No.: PIC6055B" ("6055B").[21]

233. 6055B was also nearly identical to 6055 and 6055A, but further expanded the list of the Cadillac models affected by the defect:

- Cadillac ATS (model years 2013-2016)
- Cadillac SRX (model years 2013-2016)
- Cadillac XTS (model years 2013-2016)
- Cadillac CTS Vin A (model years 2014-2016)
- Cadillac ELR (model years 2014-2016)
- Cadillac Escalade (model years 2014-2016)

//

//

---

[20] *See* Exhibit B.
[21] *See* Exhibit C.

284

Case No.

Class Action Complaint

**PIC6055C**

234. In August 2017, Defendant again issued a Technical Service Bulletin describing the same defect, titled "Bulletin No.: PIC6055C" ("6055C").[22]

235. 6055C listed the Cadillac models affected by the defect to include the following:

- Cadillac ATS (model years 2013-2017)
- Cadillac SRX (model years 2013-2017)
- Cadillac XTS (model years 2013-2017)
- Cadillac CTS Vin A (model years 2014-2017)
- Cadillac ELR (model years 2014-2017)
- Cadillac Escalade (model years 2014-2017)

**2. Vehicle Repair Data**

236. On information and belief, Defendant also knew or should have known about the Defect based on the large number of repairs performed to CUE's exhibiting delamination and spider-webbing at its network of dealerships.

237. On information and belief, Defendant regularly compiles and analyzes detailed service information regarding such repairs. Indeed, on information and belief, Defendant requires dealers to maintain detailed and meticulous records for any such repairs.

**3. Consumer Complaints Document the Defect in Class Vehicles**

    i. **Consumer Complaints and Defendant's Knowledge of and Responses to Those Complaints**

238. Plaintiffs' experiences are not isolated occurrences. Indeed, the internet is replete with consumer complaints regarding the Defect.[23]

---

[22] *See* Exhibit D.

[23] *See, e.g.,* https://www.cadillacforum.com; https://www.cadillacforums.com; http://www.freshcadillac.com/cadillac-cue-internal-peeling-issues-defects-and-scratches/; https://gm-volt.com/forum/showthread.php?181201-ELR-CUE-Spider-Cracks;

239. Importantly, Defendant's "GM Social Media Team," monitors over ninety internet forums "in order to provide customer service to those who utilize them."

240. Two such forums are the "Cadillac Forum"[24] and the Cadillac Owner/Enthusiast Website and Forum[25] (collectively, "Cadillac Websites"). In fact, the Cadillac Owner/Enthusiast Website and Forum claims to have over 130,000 members and is the largest Cadillac discussion board in the world.[26] Users of the Cadillac Websites can, for example, post information and/or pose or answer questions, including regarding issues concerning their Cadillac vehicle.

241. Through the GM Social Media Team, under the name "Cadillac Customer Service," Defendant monitors consumer complaints made on the Cadillac Websites, and works with those consumers to address their vehicle concerns.

242. At least as early as 2014, Cadillac owners complained on the Cadillac Websites about the Defect. And Defendant responded to many of those complaints.

243. For example, the following consumer complaints and Defendant's responses thereto are from the Cadillac Owner/Enthusiast Website and Forum:

(a)    On May 14, 2014, a consumer complained about the Defect:

a.   "I have an 2013 ATS 2.0 and recently I discovered there is an INTERNAL, crack started on the lower left corner of the Cue. There were no scratches or damage to the peripheral area. I discovered this on the day I parked outside lot with a record heat of over 100 degree. Don't know if there is anything to do with it but it just happened. Interested to discover if anyone heard of such a case. Again, it is internal crack and only can be

and https://www.ctsvowners.com/forum/152-2016-cts-v-talk/145586-inner-cue-screen-spider-web-cracks.html.
[24] See https://www.cadillacforum.com.
[25] See https://www.cadillacforums.com.
[26] https://www.cadillacforums.com/

1    seen but no by touch. Thanks in advance."

2    (b)    Roughly 90 minutes later, Defendant responded:

3        a.    "Hello NewbieATS,

4            I am sorry to hear of the crack you've recently noticed in your

5            vehicle. I understand you are looking for advice from other

6            forum members, but if you want your local Cadillac dealership

7            to look into this for you, please feel free to send me a private

8            message, I am more than happy to assist.

9            Regards,

10            Laura M.

11            Cadillac Customer Care"

12    (c)    On May 16, 2014, a consumer complained about the Defect:

13        a.    "Mine was brand new purchased March 2013. So far, my dealer

14            seems good about it but will find out for sure tomorrow when I

15            bring it in, but I don't expect any surprises. The cracking is

16            getting worse, but the CUE still works fine."

17    (d)    On May 17, 2014, Defendant responded:

18        a.    "Hello bravnik,

19            If you would like to further discuss your situation or keep us

20            updated after your dealership visit, please feel free to send us a

21            private message. We are more than happy to assist anyway that

22            we can!

23            Sincerely,

24            Laura M.

25            Cadillac Customer Care"

26    (e)    On July 7, 2014, a consumer complained about the Defect:

27        a.    "I took my XTS in for regular service and to take care of a

28            recall and when I picked it up from the dealer (after hours) the

1    glass over the radio/CUE was spider webbed from the inside.

2    There is no impact mark or signs of excessive pressure, the

3    outside surface is totally smooth. We are in New Orleans and it

4    was about 95 outside when I picked up the car, so the only

5    thing I can think of is the extreme heat caused it to break from

6    the inside. I have to get the car in to have the dealer look at it

7    and hopefully get it fixed thru warranty without a major

8    headache.

9    Anyone heard of this happening?

10    It's been a rough couple of weeks with my Cadillacs and glass.

11    My Escalade split a windshield sitting still in the driveway.

12    After jumping thru all the hoops Cadillac is going to replace it."

13    (f)    On July 9, 2014, Defendant responded:

14    a.    "Hello Edjeeg,

15    I hope I am not reaching out to you too late! Were you able to

16    get your CUE screen fixed by your local dealership? If you are

17    still in need of assistance, please let me know. I would be happy

18    to help. Either way, I would like to know how things are going

19    with the vehicle.

20    Katie O.

21    Cadillac Customer Care"

22    (g)    On March 25 and April 2, 2015, two consumers complained about the

23    Defect. On April 3, 2015, Defendant responded:

24    a.    "I just discovered the same problem on my 2014 CTS V-Sport.

25    Dealer says they have to look at it first to see if its covered by

26    warranty. My fear is they will try to claim I broke it."

27

28

284

Class Action Complaint

b. "I just discovered the same issue on my CTS when I came out of work today the crack is on top right cover inside the glass. Carlos did the dealer fix yours?"

c. "Hello FLCadillacGuy,

I'm sorry to learn you are experiencing concerns with your CUE display. Please let me know if I can provide an additional layer of support while you're working with the dealership. Just send me a private message with your full contact information, VIN, mileage and the name of your dealership.

Katie O.

Cadillac Customer Care"

(h)  On May 4, 2015, a consumer complained about the Defect:

a. "One more cracked CUE screen. Semi-circular cracks were first [scr]ween on the left side and then after three days, the same appeared on the right side. I do have an appointment at Ed Morse Cadillac Brandon tomorrow and hopefully, they will resolve this time. I also have problems with my liftgate (2014 SRX); when I depress the button to open the lift-gate, I hear two quick clicks and cannot open the gate. I have to try several times to beat the second click. Hopefully, this item will also be resolved."

(i)  On May 5, 2015, Defendant responded:

a. "Hello zoki.mbolekwa,

I am sorry to hear about each of these concerns with your SRX, but it is good to know that you will be working with the dealership to resolve them. Please let us know how the visit goes, and feel free to PM [private message] us if you require any additional assistance moving forward with this process.

1   Have a great day,

2   Austin J.

3   Cadillac Customer Care"

4   (j)   On June 15, 2015, a consumer complained about the Defect:

5   a.   "So, today was the hottest day in Atlanta so far this year…and

6   since I bought my CTS last November. My car sat in my work

7   parking lot for 9 hours today, closed windows and closed

8   sunroof shade. I got in it, and drove to the gym, about 40

9   minutes. I had the air on, but nothing extreme. When I came out

10   of the gym, the screen on my CUE display is "cracked" on the

11   bottom right corner, sort of in a circular pattern…definitely

12   "under" the glass (if that's what the material actually is). Has

13   this happened to anybody else? I'll be going to the dealer

14   tomorrow, but I thought I'd ask here, because I'm a little mad

15   about it tonight! Thanks!"

16   (k)   On June 16, 2015, Defendant responded:

17   a.   Hello billrat,

18   We sincerely apologize for this inconvenience with your Cue

19   screen but are happy to hear that you will be visiting the

20   dealership today. Please keep us updated on your experience

21   and feel free to reach out to us directly should you need further

22   assistance with this concern.

23   Sincerely,

24   Samantha N.

25   Cadillac Customer Care."

26   (l)   On April 19, 2016, Defendant responded to another complaint about

27   the Defect:

28   (m)   "Hello mrtimstik and Jod,

284                                   -46-                                   Case No.
Class Action Complaint

We regret to hear that you both are experiencing this concern with the CUE display screen and understand how this may be frustrating. If you would like an additional layer of support while you work with your dealership towards a resolution, we would be happy to assist. If this is something of interest to you, please feel free to send us a private message.

Kindly,

Samantha N.

Cadillac Customer Care"

244. In addition, the following consumer complaints and Defendant's responses thereto were taken from the Cadillac Forum:

(a) On February 21, 2016, a consumer complained about the Defect and on February 23, 2016, Defendant responded:

a. "Hi,

I came out to my 2014 SRX yesterday after not driving it for a few days. I noticed that the cue screen on the left side had some spider webbing cracks in the scree[n], NO impact to the screen from objects and you can't feel the cracks with your nails. I drove it for about 1 hour with the heat on and it appears to have spread into longer cracks. What gives? I'm contacting my dealer and the Cadillac customer service department and see what they are going to do. I only have 17k on it. I HOPE they don't give me a problem and say it's from abuse or misuse, it is a touch screen and I see that other Cadillac's are having the same issue.

-Jim."

b. "Hi Jim,

I'm very sorry to hear about these cracks in your CUE

screen. Were you able to get this repaired by your local

dealership? If you are still in need of assistance, please send

us a private message; we would be happy to help.

Ashley R.

Cadillac Customer Care."

(b) On January 20, 2018, a consumer complained about the Defect,
and on March 27, 2018, Defendant responded:

a. "I have a 2013 Cadillac ATS with spider cracks on my cue
screen I have 67,000 miles and I am out of warranty. When I
drive and the sunlight hits it my radio goes Garza. I've read
other forums and noticed this is an ongoing problem. It was
replaced once before when I was still under warranty and
now it's happened again. Why does this continue to
happen?"

b. "Hi, Nathan. We regret to hear of your concern with your
2013 ATS Cue Screen. We understand how frustrating
repeat concerns can be. We would like an opportunity to
review your situation further. Please e-mail us at
socialmedia@gm.com and include "ATT: Kell" in the
subject line. We look forward to your reply there.

Kell S.

Cadillac Customer Care."

(c) On March 14, 2018, in response to numerous consumer complaints
regarding the Defect, Defendant responded:

a. "We regret to hear of your concerns with your CUE screen on your 2014 SRX. We are here to help the best we can and review vehicle concerns on a case-by-case basis. We would like an opportunity to address your situation further. Please send us an e-mail at socialmedia@gm.com "ATTN: Kell" and we'll be able to assit you further. We look forward to your response there.

Kell S.

Cadillac Customer Care."

(d) On May 24, 2018, Defendant responded to a consumer complaint about the Defect, as follows:

a. "Hello, Jonscott610. We regret to see the sentiments that you have expressed. We strive to provide high quality, luxury vehicles that exceed our customers' expectations. Please know that your frustrations are certainly recognized and has been do***ented within our internal system. Should you need further assistance, please email socialmedia@gm.com."

ii. **Consumer Complaints on the Cadillac Websites Also Document How the Defect Renders Multiple CUE Features Inoperable**.

245. In addition to the numerous consumer complaints detailing the Defect on the Cadillac Websites, consumers also described how the defect negatively affected the CUE's features.

246. For example, consumers posted the following complaints on the Cadillac Owner/Enthusiast Website and Forum:

(a) December 7, 2016:

a. "I have a 2016 SRX Premium. My CUE started acting erratically and was unresponsive to touch though it jumped

all by itself. I went to the dealer who informed me there was a heat crack on the screen (which I did not see due to the glare) and that's what caused the issue. He said a part would be ordered. Its been almost a month…this is extremely annoying that I cannot answer calls and have ended up using OnStar minutes for calls because the screen would not allow me to dial using my linked phone. I fail to understand…why this part is not in stock given the common complaint of this issue (reading this thread).

(b)   September 23, 2018:

a.  "Two weeks ago, my wife noticed what started out as a small web crack in the right lower corner of the CUE display. None of the touch controls were affected. Since that time, the size of the cracking has expanded and now touch controls are erratic. Steering wheel controls are still working. I'm out of warranty so any repair is on my dime. Based on the posts I've read here on the forum, I'm fairly certain the touchscreen is going, but would like to attempt a hard reset. Are there any instructions available on how to perform a hard reset?"

247. Consumers also posted the following complaints on the Cadillac Forum:

(a)   March 2, 2017:

a.  Hello Ashely,

My name is Fabian zuniga and I own a beautiful 2013 ATS 2.0 but I am also having this issue. With dropping temperatures and using my heat my screen has cracked. First with a small spider web like crack and now it has taken over about 35% of the screen making some of the

radio/heating/cooling options unavailable. There is no
physical crack or damage to the screen itself but to the
interior glass. I'm hoping you can point me in the correct
direction to fixing this issue. I have 41985 currently
miles on my vehicle.

Fabian Zuniga.

(b)    May 25, 2018:

a.    "I have a 2014 ATS with 32k miles on it. I got into to my
car after work and I noticed that for no reason my Cue is
spider webbing and I cannot use it like the whole thing is
stuck on the home screen. I see that is a frequent
problem. My warranty expired a few months ago. It is
imperative I get this fixed due to the dangers of its spider
webbing all the way through and I will not be able to use
the backup camera. What steps can I take on getting this
issue fixed?"

(c)    September 27, 2018:

a.    "Hello,

I have a 2014 ATS 2.0 Turbo and I am having the same
problem with my vehicle. This is the second time that I
had to fix the touchscreen. Today I went to the dealership
and it will cost me $1,300.00 to get it fixed. The
dealership representative said, "this is a manufacturing
defect and he does not know why Cadillac has not issued
a recall." The spider cracks on the bottom left side of the
touchscreen are affecting the A/C, heating controls, radio
functions and the hands-free phone controls. Why should
I pay for a manufacture defect? Can anyone please direct

me to the right person/department at Cadillac to resolve
this issue?

Thank you in advance, your help is appreciated.

Rudy Arredondo, Tx."

    (d)    November 17, 2018:

        a.  "[ My dealer said it was past 3 years, so they want $1500
to fix the cracked screen. I personally know 3 other
Cadillac owners this happened to. I even bought a
100,000-mile warranty but the Cadillac dealer sold me
one that was not by GM. I only have 25k miles on my
garaged XTS. This should be recall repair.]   [ I have my
2014 SRX at my dealership today and was told it would
cost $1,060 to replace the cracked CUE screen. I keep
my car parked in a garage both at home and work. With
the volume of individuals who have this issue, the
response by Cadillac is extremely disappointing.
Unfortunately, I do not think I will invest in another
Cadillac as a result.]

        b.  Hi! Did you find a solution? I also have a 2014 with the
webbing, my screen no longer works. So frustrating."

    iii.  **Consumer Complaints to NHTSA Are Evidence of a Widespread
Problem**

248. Vehicle manufacturers are required by federal law to maintain close
contact with the National Highway Traffic Safety Administration ("NHTSA")
regarding potential safety defects.  By law, manufacturers are required to report
information regarding customer complaints and warranty claims to NHTSA, and
federal law imposes criminal penalties against manufacturers who fail to disclose

known safety defects.[27]

249. Automakers have an affirmative legal duty to disclose emerging safety-related defects to NHTSA under the Early Warning Report requirements. *Id.*

250. Vehicle manufacturers should and do monitor NHTSA databases for consumer complaints as part of their ongoing obligation to uncover and report potential safety-related defects. Defects that undermine the effectiveness of their vehicles' safety systems (including the back-up camera) are such safety-related defects. Accordingly, Defendant knew or should have known of the many complaints about CUE failures lodged with NHTSA, and the sheer number of complaints coupled with their consistency alerted or should have alerted Defendant to the Defect.

251. Certain of these complaints are set forth below:

    (a) May 13, 2016, NHTSA ID Number: 10871315

        a. "On May 13, 2014, at 10 am I had to travel less than 2 miles from my own house to my podiatric doctor. The car was stationary until the end of my appointment about 30 minutes.

        Upon going back to my house, I noticed some like scratches on the dashboard screen that house all controls, such to play a radio station etc. The[y] are on the right side of the such screen about 2 inches wide and all the way to the top."

    (b) October 3, 2017, NHTSA ID Number: 11031539

        a. "The computer on the dash that controls the backup cam radio etc. has been replaced while under warranty began cracking for no apparent reason. Cadillac will not replace the part and cannot guarantee the part will not fail a 3rd time. Told many people have this problem."

---

[27] *See generally* TREAD Act, Pub. L. No. 106-414, 114 Stat. 1800 (2000).

(c)  November 18, 2017 NHTSA ID Number: 11051698

    a.  "Shortly arriving being moved to Texas by the Army, I
noticed a hairline crack in the top left corner of my CUE
navigation system. After a few days the crack spread and
began affecting the touch screen. Initially a small section at
the bottom of the screen stopped responding to touch. Thus,
making it impossible to change radio stations or enter an
address into the navigation. Approximately a week later the
entire CUE stopped working. From what I have seen online,
this is a common issue for the Cadillac CUE shortly after
vehicles reach 50k miles."

(d)  January 14, 2018, NHTSA ID Number: 11062747

    a.  "My Cadillac Cue touch sense touch screen is no longer
functioning at any time, sitting still or while the vehicle is in
motion. The screen is spider webbed (delamination of
conductive layer of material behind the glass) and no longer
allows me to set things like the collision avoidance, auto-
braking and lane departure options as well as many other
non-safety related features. This is clearly a manufacturing
defect and I have read at one time Cadillac had a backlog of
over 4000 vehicles waiting on replacement CUE modules
but yet no voluntary recall. Hopefully the NHTSA can look
into this matter and require Cadillac to correct this problem
for owners no longer under warranty since some functions
with the touch screen are related to vehicle safety (Collision
avoidance, auto-braking and lane departure)."

(e)  June 1, 2018, NHTSA ID Number: 11099193

    a.  "TL*The contact owns a 2013 Cadillac SRX. The contact

stated that the Cadillac User Experience (CUE) Screen was cracked. As a result, the various functions that the CUE screen controlled were no longer functional. The failure occurred while at a Goodyear repair facility. The Goodyear technician informed the contact that the failure was due to extreme temperatures. The vehicle was not taken to a dealer for diagnostic testing or repairs. The manufacturer was notified and did not assist. The failure mileage was approximately 61,000."

(f) June 15, 2018, NHTSA ID Number: 11102179

a. "The Cadillac cue (information/ navigation / air condition system) developed spider web type cracks inside the screen; this makes it hard to see or use control features. I went online and found hundreds of people are having the same issue. One person has only 19,000 miles and has the web like cracks. It was 90° when i got into my car and saw a few of these cracks (these cracks are smooth to touch on screen), but a week later it's gotten bigger. A source says it's a factory defect, and that the cracks are the glue or adhesive has dissipated and is detaching the screen from the actual component. I have 44,000 miles on my vehicle ... It stays under the carport but is still having this issue. With so many people complaining and posting pictures on general motors discussion thread, one would think something would've gotten done. As stated before, it was a small line and it's constantly spreading throughout the Cadillac cue screen. It's a simple issue, but should consumers have to pay the dealership for something they have no control over? Here is

the link with others complaining about the same thing.

https://www.cadillacforum.com/forum/cadillac-Srx-10/cue-screen-spider-webbing-16740/"

(g)   June 18, 2018, NHTSA ID Number: 11102422

    a.   "My 2014 Cadillac CUE screen has developed a spider web cracks which prevent me from seeing through the screen. This has become a safety issue because I am unable to view the backup cameras. This is a known issue with Cadillac with numerous complaints. I have only 35,000 miles on my car. One day after leaving my car outside during a hot day, the cracks appeared. Cadillac/GM should be responsible for this defective product."

(h)   August 5, 2018, NHTSA ID Number: 11115815

    a.   "The CUE infotainment system is starting to fail. Several selections I.E. "Media" and "Scan" are not working. The clear screen cover has started to crack. It has come to my attention that this is a widespread problem to the degree that the system fails totally shutting down all the music capabilities, rear camera, and use of the On-Star navigation system as well."

(i)   September 29, 2018, NHTSA ID Number: 11132253

    a.   "Approximately 6 months ago, I noticed a small stress fracture appear in the bottom left corner of the central digital dashboard of my vehicle. The dashboard projects safety, entertainment and automobile operating status (e.g. deflated tires, OnStar alerts, etc.). As the fracture grew it revealed a spider web of fractures distorting the dashboard and affecting the system's operation. The system would sudden

begin flashing different icons, swiping from side to side which is very distracting. The digital icons are no longer functional, yet the fractures continue to grow, and the dashboard is very distracting while driving.

We reported the defect to Marvin k. Brown Cadillac and was informed by the service advisor, merle porter, several other SRX owners have reported the same issue, in which gm recognized as a vehicle defect. Mr. Porter reported the defect to gm, however, gm did not accept responsibility and refused to recall the component or replace the component. On 09/29/2018, i submitted a complaint to gm asking for a further investigation (case# 84675794778).

The origin of the fracture is located in the bottom left corner of the panel and no external force or impact is visible and no damage was occurred by me or my passengers. I feel this defect is a critical safety issue due to its driver distracting randomly and consisting moving icons."

(j)  October 12, 2018, NHTSA ID Number: 11139973

a.  "CUE radio, climate, navigation, Bluetooth system, keeps freezing up. Now the screen has begun to spider crack. This is a very common problem amount all Cadillac's models using the CUE. It is strange that they haven't a recall and fix. "

## CLASS ACTION ALLEGATIONS

252. Plaintiffs bring this lawsuit on behalf of themselves and as a class action on behalf of a proposed national class, defined as:

All persons and entities nationwide that purchased or leased a Class Vehicle. ("Nationwide Class").

253. Plaintiffs Vanessa Rodriguez, Benito Guzman and Cindy Uyenoyama also bring this lawsuit on behalf of themselves and as a California subclass, defined as:

> All persons and entities who purchased or leased a Class Vehicle in the State of California. ("California subclass").

254. Plaintiff William Braden also brings this lawsuit on behalf of himself and as a Florida subclass, defined as:

> All persons and entities who purchased or leased a Class Vehicle in the State of Florida. ("Florida subclass").

255. Plaintiff Norman Gagnon also brings this lawsuit on behalf of himself and as a Maine subclass, defined as:

> All persons and entities who purchased or leased a Class Vehicle in the State of Maine. ("Maine subclass").

256. Plaintiffs Crystal Robinson and Richard Schellhammer bring this lawsuit on behalf of themselves and as an Alabama subclass, defined as:

> All persons and entities who purchased or leased a Class Vehicle in the State of Alabama. ("Alabama subclass").

257. Plaintiff Maxine Glenn brings this lawsuit on behalf of herself and as a Maryland subclass, defined as:

> All persons and entities who purchased or leased a Class Vehicle in the State of Maryland. ("Maryland subclass").

258. Plaintiffs Mariano Lorenzo Macaisa and Sheila Cauthen bring this lawsuit on behalf of themselves and as a North Carolina subclass, defined as:

> All persons and entities who purchased or leased a Class Vehicle in the State of North Carolina. ("North Carolina subclass").

259. Plaintiff Gini Michelle Cox brings this lawsuit on behalf of herself and as a Texas subclass, defined as:

All persons and entities who purchased or leased a Class Vehicle in the
State of Texas. ("Texas subclass").

260. Plaintiff April Bradley brings this lawsuit on behalf of herself and as an
Indiana subclass, defined as:

All persons and entities who purchased or leased a Class Vehicle in the
State of Indiana. ("Indiana subclass").

261. Plaintiff Shon Reeves brings this lawsuit on behalf of himself and as an
Iowa subclass, defined as:

All persons and entities who purchased or leased a Class Vehicle in the
State of Iowa. ("Iowa subclass").

262.  Plaintiff Earl Kladke brings this lawsuit on behalf of himself and
as a New York subclass, defined as:

All persons and entities who purchased or leased a Class Vehicle in the
State of New York. ("New York subclass").

263.  Plaintiff David Conroe brings this lawsuit on behalf of himself
and as a West Virginia subclass, defined as:

All persons and entities who purchased or leased a Class Vehicle in the
State of West Virginia. ("West Virginia subclass").

264. Plaintiff John Toda brings this lawsuit on behalf of himself and as a
Kansas subclass, defined as:

All persons and entities who purchased or leased a Class Vehicle in the
State of Kansas.  ("Kansas subclass")

265. Collectively, the Nationwide Class and the State Subclasses will be
referred to as "the Class."

266. Excluded from the Class are Defendant and any entities in which
Defendant or its subsidiaries or affiliates have a controlling interest; Defendant's
officers, agents, and employees; attorneys for Plaintiffs and the Class; the judicial
officer to whom this action is assigned and any member of the Court's staff and

immediate families; as well as claims for personal injury, wrongful death, and emotional distress.

267. **Numerosity:** The members of the Class are so numerous that joinder of all members would be impracticable. Plaintiffs reasonably believe that Class members number in the millions of people. As such, class members are so numerous that joinder of all members is impractical. The names and addresses of class members are identifiable through documents maintained by Defendant.

268. **Commonality** and **Predominance:** This action involves common questions of law or fact, which predominate over any questions affecting individual Class members, including:

    a. Whether Defendant engaged in the conduct alleged herein;

    b. Whether Defendant designed, advertised, marketed, distributed, leased, sold, or otherwise placed Class Vehicles into the stream of commerce in the United States;

    c. Whether the CUE in the Class Vehicles contains a defect;

    d. Whether such defect causes the CUE in the Class Vehicles to malfunction;

    e. Whether Defendant knew about the Defect and, if so, how long Defendant has known of the Defect;

    f. Whether Defendant designed, manufactured, marketed, and distributed Class Vehicles with a defective CUE;

    g. Whether Defendant's conduct violates consumer protection statutes, warranty laws, and other laws as asserted herein;

    h. Whether Defendant knew or should have known that the CUE Defect would lead to the issues experienced by the Class Vehicles;

    i. Whether Defendant knew or reasonably should have known of the CUE Defect in the Class Vehicles before it sold or leased them to Class members;

j.   Whether Plaintiffs and the other Class members overpaid for their Class
     Vehicles as a result of the Defect alleged herein;

k.   Whether Plaintiffs and the other Class members are entitled to equitable
     relief, including, but not limited to, restitution or injunctive relief; and

l.   Whether Plaintiffs and the other Class members are entitled to damages
     and other monetary relief and, if so, in what amount.

269. These issues not only predominate, but they are also matters appropriate
for issue certification under Rule 23(c)(4).

270. Defendant engaged in a common course of conduct giving rise to the
legal rights sought to be enforced by Plaintiffs individually and on behalf of the other
Class members. Similar or identical statutory and common law violations, business
practices, and injuries are involved. Individual questions, if any, pale by comparison,
in both quantity and quality, to the numerous common questions that dominate this
action.

271. **Typicality:** Plaintiffs' claims are typical of the claims of the other Class
members because, among other things, Plaintiffs and the other Class members were
injured through the substantially uniform misconduct by Defendant. Plaintiffs are
advancing the same claims and legal theories on behalf of themselves and all other
class members, and there are no defenses that are unique to Plaintiffs.

272. **Adequacy of Representation:** Plaintiffs are an adequate representative
of the class because their interests do not conflict with the interests of the other class
members they seek to represent; they have retained counsel competent and
experienced in complex class action litigation, and Plaintiffs will prosecute this action
vigorously. The Class' interests will be fairly and adequately protected by Plaintiffs
and their counsel.

273. **Superiority:** A class action is superior to any other available means for
the fair and efficient adjudication of this controversy, and no unusual difficulties are
likely to be encountered in the management of this matter as a class action. The

damages, harm, or other financial detriment suffered individually by Plaintiffs and the other Class members are relatively small compared to the burden and expense that would be required to litigate their claims on an individual basis against Defendant, making it impracticable for class members to individually seek redress for Defendant's wrongful conduct. Even if class members could afford individual litigation, the court system could not. Individualized litigation would create a potential for inconsistent or contradictory judgments and increase the delay and expense to all parties and the court system.  By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

<strong>VIOLATIONS ALLEGED</strong>

**A. Claims brought on behalf of the Nationwide Class**

<strong><u>FIRST CAUSE OF ACTION</u></strong>

<strong>Violation of Magnuson-Moss Warranty Act</strong>

<strong>(15 U.S.C. §§ 2301, ET SEQ.)</strong>

274. Plaintiffs reallege and incorporate each and every allegation set forth above as if fully written herein

275. Plaintiffs bring this claim on behalf of the Nationwide Class.

276. The Vehicles are "consumer products" within the meaning of 15 U.S.C. § 2301.

277. Plaintiffs and members of the Class are "consumers" within the meaning of 15 U.S.C. § 2301 because they are persons entitled under applicable state law to enforce against the warrantor the obligations of its express and implied warranties.

278. Defendant is a "supplier" of consumer products to consumers and a "warrantor" within the meaning of 15 U.S.C. § 2301.

279. 15 U.S.C. § 2310(d)(1)(A) and/or § 2310(d)(3)(C) is satisfied because Plaintiffs properly invoke jurisdiction under the Class Action Fairness Act ("CAFA").

280. Section 2310(d)(1) of Chapter 15 of the United States Code provides a

cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

281. Defendant made written and implied warranties regarding the Vehicles to Plaintiffs and Class members within the meaning of 15 U.S.C. § 2301. Defendant provided Plaintiffs and other Class members an implied warranty of merchantability within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(7).

282. Defendant breached the implied warranty of merchantability because the Vehicles were not fit for the ordinary purpose for which such goods are used.  As described throughout the Complaint, the Vehicles contain a Defect that renders them unsafe, inconvenient, and imperfect such that Plaintiffs and Class members would not have purchased the Vehicles had they known of the Defect.

283. Pursuant to 15 U.S.C. § 2310(e), Plaintiffs are entitled to bring this class action and are not required to give Defendant notice and an opportunity to cure until such time as the Court determines the representative capacity of the Plaintiffs pursuant to Rule 23 of the Federal Rules of Civil Procedure.

284. Plaintiffs, individually and on behalf of the other Class members, seek all damages permitted by law, including diminution in value of their Vehicles, in an amount to be proven at trial.

285. In addition, pursuant to 15 U.S.C. § 2310(d)(2), Plaintiffs and the other Class members are entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorneys' fees based on actual time expended) determined by the Court to have reasonably been incurred by Plaintiffs and the other Class members in connection with the commencement and prosecution of this action.

286. Further, Plaintiffs and the Class are also entitled to equitable relief under 15 U.S.C. § 2310(d)(1) and damages as a result of Defendant's violation of its written and/or implied warranties.

//

//

**B. Claims brought on behalf of the California Subclass**

## SECOND CAUSE OF ACTION

**Violation of California Competition Law**

**(CAL. BUS. & PROF. CODE §§ 17200, ET SEQ.)**

287. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

288. Plaintiffs Rodriguez, Uyenoyama, and Guzman bring this Count on behalf of the California Class.

289. California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, et seq., proscribes acts of unfair competition, including "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."

290. GM was and is in violation of the UCL in at least the following ways:

    a. By knowingly and intentionally concealing from Plaintiffs and the other California Class members that the Class Vehicles suffer from the Defect while obtaining money from Plaintiffs;

    b. By marketing Class Vehicles as possessing functional and defect-free in-car communications and entertainment units;

    d. By refusing or otherwise failing to repair and/or replace defective CUEs in Class Vehicles;

    e. By violating federal laws, including the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301; and

    f. By violating other California laws, including Cal. Civ. Code §§ 1709, 1710, and 1750, et seq., and Cal. Comm. Code § 2313.

291. GM's conduct was unlawful because it violated federal laws, including the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301and California laws, including Cal. Civ. Code §§ 1709, 1710, and 1750, et seq., and Cal. Comm. Code § 2313.

292. GM's conduct constituted an unfair business practice because the harm

caused by GM's acts and omission as alleged herein greatly outweigh any perceived utility. Indeed, GM's failure to disclose and repair the Defect in Plaintiffs and Class Members vehicles can not be said to have any utility.

293. GM's actions alleged herein caused Plaintiffs and the other California Class members to make their purchases or leases of their Class Vehicles. Absent those omissions, Plaintiffs and the other California Class members would not have purchased or leased these Vehicles, would not have purchased or leased these Class Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain an infotainment system comparable to the CUE and which were not marketed as including such a system.

294. Accordingly, Plaintiffs and the other California Class members have suffered injury in fact including lost money or property as a result of General Motor's omissions.

295. Plaintiffs seek to enjoin further unlawful, unfair, and/or fraudulent acts or practices by General Motors under Cal. Bus. & Prof. Code § 17200.

296. Plaintiffs request that this Court enter such orders or judgments as may be necessary to enjoin General Motors from continuing its unfair, unlawful, and/or deceptive practices and to restore to Plaintiffs and members of the Class any money it acquired by unfair competition, including restitution and/or restitutionary disgorgement, as provided in Cal. Bus. & Prof. Code § 17203 and Cal. Civ. Code § 3345; and for such other relief set forth below.

## THIRD CAUSE OF ACTION

### Violation of California Consumers Legal Remedies Act

### (CAL. CIV. CODE §§ 1750, et seq.)

297. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

298. Plaintiffs Rodriguez, Uyenoyama, and Guzman bring this Count on behalf of the California Class.

299.  California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, et seq., proscribes "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer."

300. The Class Vehicles are "goods" as defined in Cal. Civ. Code § 1761(a).

301. Plaintiffs and the other California class members are "consumers" as defined in Cal. Civ. Code § 1761(d), and Plaintiffs, the other California class members, and General Motors are "persons" as defined in Cal. Civ. Code § 1761(c).

302. In purchasing or leasing the Class Vehicles, Plaintiffs and the other California Class members were deceived by General Motor's failure to disclose that the Class Vehicles were equipped with defective CUEs.

303.    General Motor's conduct, as described hereinabove, was and is in violation of the CLRA. General Motor's conduct violates at least Cal. Civ. Code § 1770(a)(5): Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he or she does not have.

304. Plaintiffs and the other California Class members have suffered injury in fact and actual damages resulting from General Motor's material omissions or misrepresentations because they paid an inflated purchase or lease price for the Class Vehicles.

305. General Motors knew, should have known, or was reckless in not knowing of the defective design and/or manufacture of the CUEs, and that the CUEs were not suitable for their intended use.

306. The facts concealed or omitted by General Motors to Plaintiffs and the other California Class members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase or lease the Class Vehicles or pay a lower price.  Had Plaintiffs and the other California Class members

known about the defective nature of the Class Vehicles and their CUEs, they would
not have purchased or leased the Class Vehicles or would not have paid the prices
they paid.

307. Plaintiffs will provide Defendant with notice of its violations of the
CLRA pursuant to California Civil Code § 1782(a). If Defendant fails to provide
appropriate relief for their violations of the CLRA within 30 days, Plaintiffs will seek
monetary, compensatory, and punitive damages, in addition to the injunctive and
equitable relief Plaintiffs seek now. Plaintiffs' and the other California Class
members' injuries were proximately caused by General Motor's fraudulent and
deceptive business practices.

308. Therefore, Plaintiffs and the other California Class members are entitled
to injunctive and equitable relief under the CLRA.

## FOURTH CAUSE OF ACTION

### Breach of Implied Warranty of Merchantability

### (CAL. COM. CODE § 2314)

309. Plaintiffs incorporate by reference all preceding allegations as though
fully set forth herein.

310.  Plaintiffs Rodriguez, Uyenoyama, and Guzman bring this Count on
behalf of the California Class.

311. General Motors is and was at all relevant times a merchant with respect
to motor vehicles under Cal. Com. Code § 2104.

312. A warranty that the Class Vehicles were in merchantable condition was
implied by law in the instant transaction, pursuant to Cal. Com. Code § 2314.

313. These Class Vehicles, when sold and at all times thereafter, were not in
merchantable condition and are not fit for the ordinary purpose for which cars are
used. Specifically, the Class Vehicles are inherently defective in that there are defects
in the CUE, rendering certain safety, communication, navigational, and entertainment
functions inoperative; and the CUE was not adequately designed, manufactured, and

tested.

314. General Motors was provided notice of these issues by numerous complaints filed against it, including this Complaint, and by numerous individual letters, telephone calls, and other communications sent by Plaintiffs and other Class members before or within a reasonable amount of time after General Motors issued the TSBs and the allegations of Class Vehicle defects became public.

315. Plaintiffs and the other Class members have had sufficient direct dealings with either General Motors or their agents (dealerships) to establish privity of contract between Plaintiffs and the other Class members. Notwithstanding this, privity is not required in this case because Plaintiffs and the other Class members are intended third-party beneficiaries of contracts between General Motors and its dealers; specifically, they are the intended beneficiaries of General Motor's implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the ultimate consumers only.  Finally, privity is also not required because Plaintiffs' and the other Class members' Class Vehicles are dangerous instrumentalities due to the aforementioned defects and nonconformities.

316. As a direct and proximate result of General Motor's breach of the warranties of merchantability, Plaintiffs and the other Class members have been damaged in an amount to be proven at trial.

## **FIFTH CAUSE OF ACTION**

### **Fraud by Concealment**

### **(Based on California Law)**

317. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

318.  Plaintiffs Rodriguez, Uyenoyama, and Guzman bring this Count on behalf of the California Class.

319.  As set forth above, General Motors concealed and/or suppressed material facts concerning the safety, quality, functionality, and reliability of their Class Vehicles. General Motors had a duty to disclose these safety, quality, functionality, and reliability issues because they consistently marketed their Class Vehicles as safe and proclaimed that safety is one of General Motors's highest corporate priorities. Once General Motors made representations to the public about safety, quality, functionality, and reliability, General Motors was under a duty to disclose these omitted facts, because where one does speak one must speak the whole truth and not conceal any facts which materially qualify those facts stated. One who volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud.

320. In addition, General Motors had a duty to disclose these omitted material facts because they were known and/or accessible only to General Motors which has superior knowledge and access to the facts, and General Motors knew they were not known to or reasonably discoverable by Plaintiffs and the other Class members. These omitted facts were material because they directly impact the safety, quality, functionality, and reliability of the Class Vehicles.

321. Whether or not the vehicle's climate systems work; whether the rearview camera monitor is working and visible in the CUE display and is otherwise in working condition; and the other functions that fail as a result of the defect alleged herein, are material safety concerns. General Motors possessed exclusive knowledge of the defects rendering the Class Vehicles inherently more dangerous and unreliable than similar vehicles.

322. General Motors actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Plaintiffs and the other Class members to purchase or lease Class Vehicles at a higher price for the Class Vehicles, which did not match the Class Vehicles' true value.

323. General Motors still has not made full and adequate disclosure and

1    continues to defraud Plaintiffs and the other Class members.

2    324. Plaintiffs and the other Class members were unaware of these omitted

3    material facts and would not have acted as they did if they had known of the

4    concealed and/or suppressed facts. Plaintiffs' and the other Class members' actions

5    were justified. General Motors was in exclusive control of the material facts and such

6    facts were not known to the public, Plaintiffs, or the Class.

7    325. As a result of the concealment and/or suppression of the facts, Plaintiffs

8    and the other Class members sustained damage.

9    326. General Motor's acts were done maliciously, oppressively, deliberately,

10   with intent to defraud, and in reckless disregard of Plaintiffs' and the other Class

11   members' rights and well-being to enrich General Motors. General Motor's conduct

12   warrants an assessment of punitive damages in an amount sufficient to deter such

13   conduct in the future, which amount is to be determined according to proof.

### SIXTH CAUSE OF ACTION

**Violation of Song-Beverly Consumer Warranty Act for Breach of Implied Warranty of Merchantability**

**(CAL. CIV. CODE §§ 1791.1 & 1792)**

18   327. Plaintiffs incorporate by reference all preceding allegations as though

19   fully set forth herein.

20   328. Plaintiffs Rodriguez, Uyenoyama, and Guzman bring this Count on

21   behalf of the California Class.

22   329. Plaintiffs and the other Class members who purchased or leased the Class

23   Vehicles in California are "buyers" within the meaning of Cal. Civ. Code § 1791(b).

24   330. The Class Vehicles are "consumer goods" within the meaning of Cal.

25   Civ. Code § 1791(a).

26   331. General Motors is a "manufacturer" of the Class Vehicles within the

27   meaning of Cal. Civ. Code § 1791(j).

28   332. General Motors impliedly warranted to Plaintiffs and the other Class

members that its Class Vehicles were "merchantable" within the meaning of Cal. Civ. Code §§ 1791.1(a) & 1792, however, the Class Vehicles do not have the quality that a buyer would reasonably expect.

333. Cal. Civ. Code § 1791.1(a) states:

"Implied warranty of merchantability" or "implied warranty that goods are merchantable" means that the consumer goods meet each of the following:

- Pass without objection in the trade under the contract description.
- Are fit for the ordinary purposes for which such goods are used.
- Are adequately contained, packaged, and labeled.
- Conform to the promises or affirmations of fact made on the container or label.

334. The Class Vehicles would not pass without objection in the automotive trade because of the defects in the Class Vehicles' CUEs that cause certain crucial safety, communication, navigational, and entertainment functions of the Class Vehicles to become inoperative.

335. Because of the Defect in the Class Vehicles' CUEs that causes certain crucial safety, communication, navigational, and entertainment functions of the Class Vehicles to become inoperative, they are not safe to drive and thus not fit for ordinary purposes.

336. The Class Vehicles are not adequately labeled because the labeling fails to disclose the Defect in the Class Vehicles' CUEs that cause certain crucial safety, communication, navigational, and entertainment functions of the Class Vehicles to become inoperative.

337. General Motors breached the implied warranty of merchantability by manufacturing and selling Class Vehicles containing the Defect associated with the

CUE. Furthermore, the Defect has caused Plaintiffs and the other Class members to not receive the benefit of their bargain and have caused Class Vehicles to depreciate in value.

338. As a direct and proximate result of General Motor's breach of the implied warranty of merchantability, Plaintiffs and the other Class members received goods whose dangerous and dysfunctional condition substantially impairs their value to Plaintiffs and the other Class members. Plaintiffs and the other Class members have been damaged as a result of the diminished value of General Motor's products, the products' malfunctioning, and the nonuse of their Class Vehicles.

339. Pursuant to Cal. Civ. Code §§ 1791.1(d) & 1794, Plaintiffs and the other Class members are entitled to damages and other legal and equitable relief including, at their election, the purchase price of their Class Vehicles, or the overpayment or diminution in value of their Class Vehicles.

340. Pursuant to Cal. Civ. Code § 1794, Plaintiffs and the other Class members are entitled to costs and attorneys' fees.

**C. Claims brought on behalf of the Florida Subclass**

**<u>SEVENTH CAUSE OF ACTION</u>**

**Violation of Florida Deceptive and Unfair Trade Practices Act**

**(FLA. STAT. § 501.201, ET SEQ.)**

341. Plaintiff William Braden ("Plaintiff" for purposes of all Florida Class Counts) incorporates by reference all paragraphs as though fully set forth herein.

342. Plaintiff brings this claim on behalf of the Florida Class.

343. Plaintiff and the other Florida Class members are 'consumers', as defined by § 501.203(7) of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA").

344. General Motors engaged in "trade or commerce", as defined by § 501.203(8) of the FDUTPA.

345. The sale of the Vehicles to Plaintiff and other Florida Class members was

a "consumer transaction", as defined by § 1345.01 of the FDUTPA.

346. Section 501.204(1) of the Florida Deceptive and Unfair Trade Practices Act prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce…" Fla. Stat. § 501.204(1). General Motors participated in unfair and deceptive trade practices that violated the FDUTPA as described herein.

347. By not disclosing the defective nature of the CUE General Motors has willfully and knowingly engaged in unfair and deceptive acts in the conduct of trade and commerce within the State of Florida.

348. In purchasing or leasing the Vehicles, Plaintiff and the other Florida Class members were deceived by General Motors' failure to disclose that the CUE in the Vehicles was defective.

349. Plaintiff and the other Florida Class members reasonably relied upon General Motors' false misrepresentations and omissions. They had no way of knowing that General Motor's representations were false, misleading, and incomplete. As alleged herein, General Motors willfully and knowingly engaged in a pattern of deception and public silence in the face of a known Defect with the CUE. Plaintiff and the other Florida Class members did not, and could not, unravel General Motors' deception on their own.

350. General Motors' actions as set forth above occurred in the conduct of trade or commerce.

351. General Motors' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

352. General Motors willfully and knowingly misrepresented material facts regarding the Vehicles with intent to mislead Plaintiff and the other Florida Class members.

353. General Motors knew or should have known that its conduct violated the FDUTPA.

354. General Motors owed Plaintiff and the other Florida Class members a duty to disclose the truth about its faulty infotainment system because the Defect created a safety hazard and General Motors:

(a) Possessed exclusive knowledge of the defect in the CUE;

(b) Intentionally concealed the foregoing from Plaintiff and the other Florida Class members; and/or

(c) Made incomplete representations in advertisements and on its website, failing to warn the public or to publicly admit that the CUE was defective.

355. General Motors had a duty to disclose that the infotainment system in the Vehicles was fundamentally flawed as described herein, because the defect created a safety hazard and Plaintiff and the other Florida Class members relied on General Motors' material misrepresentations and omissions regarding the technology, benefits, efficiency, convenience, performance, and safety features of the infotainment system.

356. General Motors' conduct proximately caused injuries to Plaintiff and the other Florida Class members who purchased or leased the Vehicles and suffered harm as alleged herein.

357. Plaintiff and the other Florida Class members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of General Motors' conduct in that Plaintiff and the other Florida Class members incurred costs, including overpaying for their Vehicles that have suffered a diminution in value.

358. General Motors' violations cause continuing injuries to Plaintiff and the other Florida Class members. General Motors' unlawful acts and practices complained of herein affect the public interest.

359. Plaintiff and the other Florida Class members seek damages and treble damages for General Motors' knowing violations.

360. Plaintiff and the other Florida Class members also seek court costs and

attorneys' fees.

# EIGHTH CAUSE OF ACTION

## Fraudulent Concealment

## (Based on Florida Law)

361. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

362. Plaintiff brings this claim on behalf of the Florida Class.

363. General Motors intentionally concealed that the CUE is defective.

364. General Motors further affirmatively misrepresented to Plaintiff in advertising and other forms of communication, including standard and uniform material provided with each car and on its website, that the Vehicles it was selling had no significant defects, that the CUE was a safety feature, reliable, and would perform and operate properly.

365. General Motors knew about the defect in the CUE when these representations were made.

366. The Vehicles purchased by Plaintiff and the other Florida Class members contained a CUE.

367. General Motors had a duty to disclose that the CUE contained a fundamental defect as alleged herein, because the defect created a safety hazard and Plaintiff and the other Florida Class members relied on General Motors' material representations.

368. As alleged herein, at all relevant times, General Motors has held out the Vehicles to be free from defects such as the defect related to the CUE. General Motors touted and continues to tout the many benefits and advantages of the CUE, but nonetheless failed to disclose important facts related to the defect. This made General Motors' other disclosures about the CUE deceptive.

369. The truth about the defective CUE was known only to General Motors; Plaintiff and the other Florida Class members did not know of these facts and General

Motors actively concealed these facts from Plaintiff and the other Florida Class members.

370. Plaintiff and the other Florida Class members reasonably relied upon General Motors' deception. They had no way of knowing that General Motors' representations were false, misleading, or incomplete. As consumers, Plaintiff and the other Florida Class members did not, and could not, unravel General Motors' deception on their own. Rather, General Motors intended to deceive Plaintiff and the other Florida Class members by concealing the true facts about the Vehicles' CUEs.

371. General Motors' false representations and omissions were material to consumers because they concerned qualities of the Vehicles that played a significant role in the value of the Vehicles.

372. General Motors had a duty to disclose the infotainment system defect and violations with respect to the Vehicles because details of the true facts were known and/or accessible only to General Motors, because General Motors had exclusive knowledge as to such facts, and because General Motors knew these facts were not known to or reasonably discoverable by Plaintiff or Class members.

373. General Motors also had a duty to disclose because it made general affirmative representations about the technological and safety innovations included with its Vehicles, without telling consumers that one of the features had a fundamental defect that would affect the safety, quality and performance of the Vehicles.

374. General Motors' disclosures were misleading, deceptive, and incomplete because they failed to inform consumers of the additional facts regarding the defect in the infotainment system as set forth herein. These omitted and concealed facts were material because they directly impact the value of the Vehicles purchased by Plaintiff and the other Florida Class members.

375. General Motors has still not made full and adequate disclosures and continues to defraud Plaintiff and the other Florida Class members by concealing material information regarding the defect in the infotainment system.

376. Plaintiff and the other Florida Class members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased or paid as  much for cars with faulty technology, and/or would have taken other affirmative steps in light of the information concealed from them. Plaintiff's and the other Florida Class members' actions were justified. General Motors was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiff, or Class members.

377. Because of the concealment and/or suppression of facts, Plaintiff and the other Florida Class members sustained damage because they own(ed) Vehicles that are diminished in value as a result of General Motors' concealment of the true quality of those Vehicles' CUEs. Had Plaintiff and the other Florida Class members been aware of the defect in the CUEs installed in the Vehicles, and the Company's disregard for the truth, Plaintiff and the other Florida Class members who purchased or leased a Vehicle would have paid less for it or would not have purchased or leased it at all.

378. The value of Plaintiff's and the other Florida Class members' Vehicles has diminished as a result of General Motors' fraudulent concealment of the defective infotainment system of the Vehicles, which has made any reasonable consumer reluctant to purchase any of the Vehicles, let alone pay what otherwise would have been fair market value for the Vehicles.

379. Accordingly, General Motors is liable to Plaintiff and the other Florida Class members for damages in an amount to be proven at trial.

380. General Motors' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and the other Florida Class members' rights and the representations that General Motors made to them, in order to enrich General Motors. General Motors' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the

future, which amount is to be determined according to proof.

## NINTH CAUSE OF ACTION

### Breach of Implied Warranty

### (FLA. STAT. § 672.314)

381. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

382. Plaintiff brings this claim on behalf of the Florida Class.

383. Plaintiff was at all relevant times a "buyer", as defined by § 672.103 of the Florida Uniform Commercial Code.

384. General Motors was at all relevant times a "merchant", as defined by § 672.104 of the Florida Uniform Commercial Code.

385. The Vehicles are and were at all relevant times "goods", as defined by § 672.105 of the Florida Uniform Commercial Code.

386. General Motors marketed the Vehicles as safe and reliable luxury vehicles. Such representations formed the basis of the bargain in Plaintiff's and the other Florida Class members' decisions to purchase the Vehicles.

387. Plaintiff and the other Florida Class members purchased or leased the Vehicles from General Motors, through General Motors' authorized agents for retail sales, through private sellers, or were otherwise expected to be the eventual purchasers of the Vehicles when bought from a third party. At all relevant times, General Motors was the manufacturer, distributor, warrantor, and/or seller of the Vehicles.

388. General Motors knew or had reason to know of the specific use for which the Vehicles were purchased or leased.

389. General Motors impliedly warranted that the Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used.

390. Because of the defect in the CUE, the Vehicles were not in merchantable condition when sold and are not fit for the ordinary purpose of providing safe and reliable transportation.

391. General Motors knew about the defect in the CUEs, allowing General Motors to cure their breach of its warranty if it chose.

392. General Motors' attempt to disclaim or limit the implied warranty of merchantability vis-à-vis consumers is unconscionable and unenforceable here. Specifically, General Motors' warranty limitation is unenforceable because they knowingly sold or leased a defective product without informing consumers about the defect. The time limits contained in General Motors' warranty periods were also unconscionable and inadequate to protect Plaintiff and the other Florida Class members. Among other things, Plaintiff and the other Florida Class members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored General Motors. A gross disparity in bargaining power existed between General Motors and other Florida Class members, and General Motors knew of the defect at the time of sale.

393. Plaintiff and the other Florida Class members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of General Motors' conduct described herein. Affording General Motors, a reasonable opportunity to cure the breach of written warranties therefore would be unnecessary and futile.

394. Accordingly, General Motors is liable to Plaintiff and the other Florida Class members for damages in an amount to be proven at trial.

## TENTH CAUSE OF ACTION

### Unjust Enrichment

### (BASED ON FLORIDA LAW)

395. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

396. Plaintiff brings this claim on behalf of the Florida Class.

397. General Motors has benefitted and been enriched by the conduct alleged herein. General Motors has generated substantial revenue from the unlawful conduct

described herein. General Motors has knowledge and appreciation of this benefit, which was conferred upon it by and at the expense of Plaintiff and the other Florida Class members.

398. General Motors has voluntarily accepted and retained this benefit.

399. The circumstances, as described herein, are such that it would be inequitable for General Motors to retain the ill-gotten benefit without paying the value thereof to Plaintiff and the other Florida Class members.

400. Plaintiff and the other Florida Class members are entitled to the amount of General Motors' ill-gotten gains, including interest, resulting from their unlawful, unjust, unfair, and inequitable conduct as alleged herein.

## D. Claims brought on behalf of the Maine Subclass

### ELEVENTH CAUSE OF ACTION

### Breach of Implied Warranty

### (ME. REV. STAT. TIT. 11 §§ 2-314 and 2-1212)

401. Plaintiff reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

402. Plaintiff Gagnon brings this Count on behalf of the Maine Class.

403. General Motors is a "merchant" with respect to motor vehicles under Me. Rev. Stat. Ann. Tit. 11, §§ 2-104(1), and 2-1103(3), and is a "seller" of motor vehicles under § 2- 103(1)(d).

404. The Class Vehicles are and were at all relevant times "goods" within the meaning of Me. Rev. Stat. Ann. Tit. 11, §§ 2-105(1), and 2-1103(1)(h).

405. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Me. Rev. Stat. Ann. Tit. 11, §§ 2 314, and 2-1212.

406. These Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used.

407. Because of the defect in the CUE, the Vehicles were not in merchantable condition when sold and are not fit for the ordinary purpose of providing safe and reliable transportation.

408. General Motors knew about the defect in the CUEs, allowing General Motors to cure their breach of its warranty if it chose.

As a direct and proximate result of General Motors' breach of the implied warranty of merchantability, Plaintiff and the other Maine Class members have been damaged in an amount to be proven at trial.

## TWELFTH CAUSE OF ACTION

## Violation of Maine's Unfair Trade Practices Act ("MUTPA")

## (5 ME.REV.STAT. ANN. § 205–A)

409. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

410. Plaintiff Gagnon, and the Maine Class members, as well as General Motors, are "persons" within the meaning of the MUTPA, and the Vehicles are consumer goods within the meaning of MUTPA.

411. At all pertinent times, General Motors was engaged in "trade" and "commerce" within the meaning of MUTPA.

412. The MUTPA prohibits unfair methods of competition, as well as unfair, deceptive and unconscionable acts or practices in consumer and other sales transactions and provides consumers with private rights of action to redress such conduct.

413. General Motors' business acts and practices alleged herein constitute unfair methods of competition, as well as unfair, deceptive and unconscionable acts or practices, within the meaning of the MUTPA.

414. General Motors acted in the face of prior notice that its conduct was deceptive, unfair and unconscionable. It is well-established in MUTPA jurisprudence that material omissions regarding a product constitute violations of these statutes.

415. General Motors violated the MUTPA by inserting an unconscionable provision into a contract and limiting its warranties, when it knew or should have known the Vehicles were defective.

416. General Motors violated the MUTPA by fraudulently concealing from and/or intentionally failing to disclose to Plaintiff Gagnon and the Maine Class the true nature and costs associated with the Vehicles.

417. General Motors violated the MUTPA by selling Vehicles that could not be reasonably repaired and instead require prohibitively high costs to repair or replace CUE.

418. General Motors actively concealed its knowledge regarding the inherent defect of the Vehicles' CUE.

419. General Motors failed to act in the face of prior notice regarding the problems associated with the Vehicles, thereby rendering its conduct unconscionable under all of the circumstances.

420. The omissions by General Motors were likely to deceive reasonable consumers, and a reasonable consumer would have relied on these omissions.

421. General Motors intended that Plaintiff Gagnon, and the Maine Class members would rely on its omissions, which occurred in the course of conduct involving trade and commerce.

422. General Motors had a duty to disclose the Defect in the Vehicles, the high cost of repairing or replacing CUE, and the markedly lower useful life of the Vehicles infotainment system when compared to other infotainment systems on the market. By concealing this information that was material to Plaintiff Gagnon, and the Maine Class members, General Motors violated the MUTPA.

423. Had General Motors disclosed all material information regarding the Vehicles to Plaintiff Gagnon and other members of the Maine Class, they would not have purchased or leased the Vehicles, or would have paid significantly less for them.

424. To this day, General Motors continues to violate the MUTPA by actively

concealing the material information about the Vehicles and their torque converter and transmission, and by representing to Plaintiff Gagnon and members of the Maine Class that the Vehicles are defect-free and safe.

425. As a direct and proximate cause of General Motors' violations of the MUTPA, Plaintiff Gagnon and the Maine Class have suffered injury in fact and/or actual damage, in that they purchased or leased Vehicles with defective CUEs that are unreasonably expensive to repair and/or replace. Had General Motors disclosed the true quality, nature and drawbacks of the Vehicles, Plaintiff Gagnon and the Maine Class members would not have purchased, or would have paid significantly less, for the Vehicles. Plaintiff Gagnon and the Maine Class have suffered further harm in that the Vehicles' CUE fail prematurely, they have paid or will be required to pay significantly more to repair or replace the CUE than is reasonably anticipated and represented, they have lost use of their Vehicles, and the Vehicles have suffered diminution in value.

426. General Motors' violations of the MUTPA were knowing and willful.

427. Plaintiff Gagnon on behalf of himself and the Maine Class, demands judgment against General Motors for equitable relief available under the MUTPA, and further reserves the right to subsequently seek monetary damages as permitted by the MUTPA.

**E. Claims brought on behalf of the Alabama Subclass**

**THIRTEENTH CAUSE OF ACTION**

**Violation of Alabama's Deceptive Trade Practices Act ("Alabama DTPA")**

**(Ala. Code §§ 8-19-1, et Seq.)**

428. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint

429. Plaintiffs Robinson and Schellhammer and the Alabama Sub-Class are "consumers" within the meaning of Ala. Code § 8-19-3(2).

430. Plaintiffs, the Alabama Sub-Class, and General Motors are "persons"

within the meaning of Ala. Code § 8-19-3(5).

431. The Class Vehicles and/or the Defective CUEs in them are "goods" within the meaning of Ala. Code. § 8-19-3(3).

432. Defendant was and is engaged in "trade or commerce" within the meaning of Ala. Code § 8-19-3(8).

433. The Alabama Deceptive Trade Practices Act ("Alabama DTPA") declares several specific actions to be unlawful, including: "(5) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities that they do not have," "(7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another," and "(27) Engaging in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce." Ala. Code § 8-19-5.

434. By failing to disclose and by actively concealing the defective nature of the CUE installed in the Class Vehicles, Defendant engaged in deceptive business practices prohibited by the Alabama DTPA, including: representing that the Class Vehicles and/or the CUEs installed in them have characteristics, uses, benefits, and qualities which they do not have; representing that they are of a particular standard, quality, and grade when they are not; advertising them with the intent not to sell or lease them as advertised and engaging in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce.

435. Defendant also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles and/or the CUEs installed in them.

436. General Motors knew, should have known, or was reckless in not knowing of the defective design and/or manufacture of the CUEs, and that the CUEs

were not suitable for their intended use.

437. By failing to disclose and by actively concealing the Defect in the Class Vehicles and/or the CUEs installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendant engaged in unfair or deceptive business practices in violation of the Alabama DTPA. Defendant deliberately withheld the information about the propensity of the CUEs to delaminate and/or fail, in order to ensure that consumers would purchase the Class Vehicles.

438. In the course of Defendant's business, they willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and the serious Defect discussed above. Defendant compounded the deception by repeatedly asserting that the Class Vehicles and/or the CUEs installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

439. Defendant's unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead, tended to create a false impression in consumers, were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of Class Vehicles and/or CUEs installed in them, the quality of Defendant's brands, and the true value of the Class Vehicles.

440. Defendant intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the CUE installed in them with an intent to mislead Plaintiffs and the Alabama Sub-Class.

441. Defendant knew or should have known that their conduct violated the Alabama DTPA.

442. As alleged above, Defendant made material statements about the safety and reliability of the Class Vehicles and/or the CUEs installed in them that were either false or misleading.

443. To protect their profits and to avoid remediation costs and a public

relations nightmare, Defendant concealed the dangers and risks posed by the Class Vehicles and/or the CUEs installed in them and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles and allowed them to continue driving unsafe vehicles.

444. Defendant owed Plaintiffs a duty to disclose the true safety and reliability of the Class Vehicles and/or the CUEs installed in them because Defendant:

(a) Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

(b) Intentionally concealed the foregoing from Plaintiffs; and/or

(c) Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

445. Because Defendant fraudulently concealed the Defect in Class Vehicles and/or the CUE installed in them, the value of the Class Vehicles has greatly diminished. In light of the stigma attached to Class Vehicles by Defendant's conduct, they are now worth significantly less than they otherwise would be.

446. Defendant's failure to disclose and active concealment of the dangers and risks posed by the CUE in Class Vehicles were material to Plaintiffs and the Alabama Sub-Class. A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

447. Plaintiffs and the Alabama Sub-Class suffered ascertainable loss caused by Defendant's misrepresentations and their failure to disclose material information. Had they been aware of the CUE Defect that existed in the Class Vehicles and/or the CUE installed in them, and Defendant's complete disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all. Plaintiffs did not receive the benefit of their bargain as a result of Defendant's misconduct.

448. Defendant's violations present a continuing risk to Plaintiffs, the Alabama Sub- Class, as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

449. As a direct and proximate result of Defendant's violations of the Alabama DTPA, Plaintiffs and the Alabama Sub-Class have suffered injury-in-fact and/or actual damage.

450. Pursuant to Ala. Code § 8-19-10, Plaintiffs and the Alabama Sub-Class seek monetary relief against Defendant measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $100 for each Plaintiff and each Alabama Sub-Class member.

451. Plaintiffs also seek an order enjoining Defendant's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Ala. Code § 8-19-1, et seq.

452. In accordance with Ala. Code § 8-19-10(e), Plaintiffs' counsel, on behalf of Plaintiffs, served Defendant with notice of their alleged violations of the Alabama DTPA relating to the Class Vehicles and/or the CUE installed in them purchased by Plaintiffs and the Alabama Sub-Class, and demanded that Defendant correct or agree to correct the actions described therein. If Defendant fails to do so, Plaintiffs will amend this Complaint as of right (or otherwise seek leave to amend the Complaint) to include compensatory and monetary damages to which Plaintiffs and Class Members are entitled.

## FOURTEENTH CAUSE OF ACTION

### Unjust Enrichment

### (Based on Alabama law)

453. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

454. Plaintiffs Robinson and Schellhammer bring this claim on behalf of the Alabama Class.

455. General Motors has benefitted and been enriched by the conduct alleged herein. General Motors has generated substantial revenue from the unlawful conduct described herein. General Motors has knowledge and appreciation of this benefit, which was conferred upon it by and at the expense of Plaintiffs and the other Alabama Class members.

456. General Motors has voluntarily accepted and retained this benefit.

457. The circumstances, as described herein, are such that it would be inequitable for General Motors to retain the ill-gotten benefit without paying the value thereof to Plaintiffs and the other Alabama Class members.

458. Plaintiffs and the other Alabama Class members are entitled to the amount of General Motors' ill-gotten gains, including interest, resulting from their unlawful, unjust, unfair, and inequitable conduct as alleged herein.

## FIFTEENTH CAUSE OF ACTION

### Fraudulent Concealment

### (Based on Alabama law)

459. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

460. Plaintiffs Robinson and Schellhammer bring this claim on behalf of the Alabama Class.

461. General Motors intentionally concealed that the CUE is defective.

462. General Motors further affirmatively misrepresented to Plaintiffs in advertising and other forms of communication, including standard and uniform material provided with each car and on its website, that the Vehicles it was selling had no significant defects, that the CUE was a safety feature, reliable, and would perform and operate properly.

463. General Motors knew about the defect in the CUE when these representations were made.

464. The Vehicles purchased by Plaintiffs and the other Alabama Class

members contained a CUE.

465. General Motors had a duty to disclose that the CUE contained a fundamental defect as alleged herein, because the defect created a safety hazard and Plaintiffs and the other Alabama Class members relied on General Motors' material representations.

466. As alleged herein, at all relevant times, General Motors has held out the Vehicles to be free from defects such as the defect related to the CUE. General Motors touted and continues to tout the many benefits and advantages of the CUE, but nonetheless failed to disclose important facts related to the defect. This made General Motors' other disclosures about the CUE deceptive.

467. The truth about the defective CUE was known only to General Motors; Plaintiffs and the other Alabama Class members did not know of these facts and General Motors actively concealed these facts from Plaintiffs and the other Alabama Class members.

468. Plaintiffs and the other Alabama Class members reasonably relied upon General Motors' deception. They had no way of knowing that General Motors' representations were false, misleading, or incomplete. As consumers, Plaintiffs and the other Alabama Class members did not, and could not, unravel General Motors' deception on their own. Rather, General Motors intended to deceive Plaintiffs and the other Alabama Class members by concealing the true facts about the Vehicles' CUEs.

469. General Motors' false representations and omissions were material to consumers because they concerned qualities of the Vehicles that played a significant role in the value of the Vehicles.

470. General Motors had a duty to disclose the infotainment system defect and violations with respect to the Vehicles because details of the true facts were known and/or accessible only to General Motors, because General Motors had exclusive knowledge as to such facts, and because General Motors knew these facts were not known to or reasonably discoverable by Plaintiffs or Alabama Class members.

471. General Motors also had a duty to disclose because it made general affirmative representations about the technological and safety innovations included with its Vehicles, without telling consumers that one of the features had a fundamental defect that would affect the safety, quality and performance of the Vehicles.

472. General Motors' disclosures were misleading, deceptive, and incomplete because they failed to inform consumers of the additional facts regarding the defect in the infotainment system as set forth herein. These omitted and concealed facts were material because they directly impact the value of the Vehicles purchased by Plaintiffs and the other Alabama Class members.

473. General Motors has still not made full and adequate disclosures and continues to defraud Plaintiffs and the other Alabama Class members by concealing material information regarding the defect in the infotainment system.

474. Plaintiffs and the other Alabama Class members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased or paid as  much for cars with faulty technology, and/or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and the other Alabama Class members' actions were justified. General Motors was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Class members.

475. Because of the concealment and/or suppression of facts, Plaintiffs and the other Alabama Class members sustained damage because they own(ed) Vehicles that are diminished in value as a result of General Motors' concealment of the true quality of those Vehicles' CUEs. Had Plaintiffs and the other Alabama Class members been aware of the defect in the CUEs installed in the Vehicles, and the Company's disregard for the truth, Plaintiffs and the other Alabama Class members who purchased or leased a Vehicle would have paid less for it or would not have purchased or leased it at all.

476. The value of Plaintiffs' and the other Alabama Class members' Vehicles has diminished as a result of General Motors' fraudulent concealment of the defective infotainment system of the Vehicles, which has made any reasonable consumer reluctant to purchase any of the Vehicles, let alone pay what otherwise would have been fair market value for the Vehicles.

477. Accordingly, General Motors is liable to Plaintiffs and the other Alabama Class members for damages in an amount to be proven at trial.

478. General Motors' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the other Alabama Class members' rights and the representations that General Motors made to them, in order to enrich General Motors. General Motors' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

### F. Claims brought on behalf of the Maryland Subclass

### SIXTEENTH CAUSE OF ACTION

### Violations of the Maryland Consumer Protection Act ("MCPA")

479. Plaintiff Glenn, and the Maryland Class members are consumer within the meaning of the MCPA and Md. Code Ann., Commercial Law § 13-101, et seq.

480. The Vehicles are consumer goods within the meaning of the MCPA and provided services within the MCPA's meaning of the term consumer services.

481. The MCPA prohibits the use of any "unfair or deceptive trade practice" in the sale or lease of any consumer goods or services.

482. General Motors violated the MCPA by, inter alia, engaging in the following unfair deceptive acts or practices:

    (a)  Failing to disclose material facts that deceived and had the tendency to deceive; and

    (b)  Engaging in deception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or

omission of any material fact with the intent that a consumer rely on the same in connection with: (i) the promotion or sale of consumer goods or services; or (ii) the subsequent performance of a merchant with respect to an agreement of sale or lease.

483. General Motors violated the MCPA by concealing, suppressing or omitting material facts regarding the Vehicles, including, but not limited to, the fact that the Vehicles' CUE is defective, that as a result of such defect, the Vehicles' CUE fails prematurely, and that the cost of replacing or repairing the CUE is prohibitively high. This concealed or omitted information is the type of information upon which a consumer would be expected to rely on in making a decision whether to purchase, or how much to pay for, the Vehicles.

484. General Motors concealed, suppressed or omitted these material facts in conducting trade and commerce with the intent that Plaintiff Glenn, and the Maryland Class would rely on the omissions in the purchase or lease of their Vehicles.

485. To this day, General Motors continues to violate the MCPA by actively concealing the material information about the Vehicles and their CUEs by representing to Plaintiff Glenn, and members of the Maryland Class that the Vehicles are defect-free and safe.

486. General Motors intended that Plaintiff Glenn, and the Maryland Class members would rely on its concealment and omission of material facts, which occurred in the course of conduct involving trade and commerce.

487. As a direct and proximate cause of General Motors' violations of the MCPA, Plaintiff Glenn, and the Maryland Class have suffered injury in fact and/or actual damage, in that they purchased or leased Vehicles with defective CUEs that are unreasonably expensive to repair and/or replace. Had General Motors disclosed the true quality, nature and drawbacks of the Vehicles, Plaintiff Glenn, and the Maryland Class members would not have purchased, or would have paid significantly less, for the Vehicles. Plaintiff Glenn, and the Maryland Class have suffered further harm in

that the Vehicles' CUEs fail prematurely, they have paid or will be required to pay significantly more to repair or replace the CUE than is reasonably anticipated and represented, and the Vehicles have suffered diminution in value.

488. Plaintiff Glenn, and the Maryland Class are entitled to recover damages, reasonable attorneys' fees and costs, and expert expenses as a result of General Motors' violations of the MCPA.

## SEVENTEENTH CAUSE OF ACTION

### Breach of Implied Warranty of Merchantability

### (MD. CODE COM. LAW §§ 2-314 AND 2A-212)

489. Plaintiff Glenn realleges and incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

490. Plaintiff Glenn brings this Count on behalf of the Maryland Class.

491. General Motors is and was at all relevant times a "merchant" with respect to motor vehicles under Md. Code Com. Law § 2-104(1) and a "seller" of motor vehicles under § 2-103(1)(d).

492. With respect to leases, General Motors is and was at all relevant times a "lessor" of motor vehicles under Md. Code Com. Law § 2A-103(1)(p).

493. The Class Vehicles are and were at all relevant times "goods" within the meaning of Md. Code Com. Law §§ 2-105(1) and 2a-103(1)(h).

494. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Md. Code Com. Law §§ 2-314, and 2a-212.

495. These Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used.

496. Because of the defect in the CUE, the Vehicles were not in merchantable condition when sold and are not fit for the ordinary purpose of providing safe and reliable transportation.

497. General Motors was provided notice of these issues by the numerous complaints filed against it including the instant Complaint, and by numerous individual inquires and communications sent by Plaintiff and other Maryland Class Members and others within a reasonable amount of time after the allegations of Class Vehicle defects became public.

498. As a direct and proximate result of General Motors' breach of the implied warranty of merchantability, Plaintiff and the other Maryland Class members have been damaged in an amount to be proven at trial.

## EIGHTEENTH CAUSE OF ACTION

### Unjust Enrichment

### (Based on Maryland Law)

499. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

500. Plaintiff Glenn brings this claim on behalf of the Maryland Class.

501. General Motors has benefitted and been enriched by the conduct alleged herein. General Motors has generated substantial revenue from the unlawful conduct described herein. General Motors has knowledge and appreciation of this benefit, which was conferred upon it by and at the expense of Plaintiff and the other Maryland Class members.

502. General Motors has voluntarily accepted and retained this benefit.

503. The circumstances, as described herein, are such that it would be inequitable for General Motors to retain the ill-gotten benefit without paying the value thereof to Plaintiff and the other Maryland Class members.

504. Plaintiff and the other Maryland Class members are entitled to the amount of General Motors' ill-gotten gains, including interest, resulting from their unlawful, unjust, unfair, and inequitable conduct as alleged herein.

//

//

## G. Claims brought on behalf of the North Carolina Subclass

## <u>NINETEENTH CAUSE OF ACTION</u>

### Breach of Implied Warranty of Merchantability

### (N.C. GEN. STAT. § 25-2-314)

505. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

506. Plaintiffs Macasia and Cauthen bring this Count on behalf of the North Carolina Class.

507. General Motors is and was at all relevant times a merchant with respect to motor vehicles.

508. A warranty that the Class Vehicles were in merchantable condition is implied by law in the instant transactions.

509. These Class Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the Class Vehicles are inherently defective in that there are defects in the Class Vehicles' CUEs rendering certain crucial safety, communication, navigational, and entertainment functions inoperative.

510. General Motors was provided notice of these issues by numerous complaints filed against it, including the instant Complaint, and by numerous individual letters and communications sent by Plaintiffs and other Class members before or within a reasonable amount of time after General Motors issued the TSBs and the allegations of Class Vehicle defects became public.

511. As a direct and proximate result of General Motors' breach of the warranties of merchantability, Plaintiffs and the other Class members have been damaged in an amount to be proven at trial.

//

//

//

## **TWENTIETH CAUSE OF ACTION**

### **Violation of the North Carolina Unfair and Deceptive Trade Practices Act**

### **(N.C. GEN. STAT. §75.1-1)**

512. Plaintiffs Macaisa and Cauthen ("Plaintiffs" for purposes of all North Carolina Class Counts) incorporates by reference all preceding allegations as though fully set forth herein.

513. This claim is brought by Plaintiffs on behalf of the North Carolina Class.

514.  North Carolina's Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75.1-1 ("UDTPA") prohibits "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce."

515. Defendant's business acts and practices alleged herein violate the UDTPA.

516. The purchase or lease of the Vehicles by Plaintiffs and the North Carolina Class members as described herein constitute transactions in commerce within the meaning of UDTPA.

517. General Motors violated the UDTPA by concealing and failing to disclose the CUE Defects. General Motors had an ongoing duty to Plaintiffs and the North Carolina Class members to refrain from unfair and deceptive practices under the UDTPA in the course of its business

518. The practices of Defendant violate the UDTPA for, inter alia, one or more of the following reasons:

    (a)   Defendant represented that goods or services have sponsorship, approval, characteristics, uses, and benefits that they do not have;

    (b)  Defendant provided, disseminated, marketed, and otherwise distributed uniform false and misleading advertisements, technical data and other information to consumers regarding the performance, reliability, quality and nature of the Vehicles;

    (c)  Defendant represented that goods or services were of a particular

standard, quality, or grade, when they were of another;

(d) Defendant engaged in unconscionable commercial practices in failing to reveal material facts and information about the Vehicles, which did, or tended to, mislead Plaintiffs and the North Carolina Class members about facts that could not reasonably be known by the consumer;

(e) Defendant failed to reveal facts that were material to the transactions in light of representations of fact made in a positive manner;

(f) Defendant caused Plaintiffs and the North Carolina Class members to suffer a probability of confusion and a misunderstanding of legal rights, obligations and/or remedies by and through its conduct;

(g) Defendant purported to disclaim or limit the implied warranty of merchantability without providing such disclaimer or limitation in a clear, truthful and conspicuous manner;

(h) Defendant failed to reveal material facts to Plaintiffs and the North Carolina Class members, the omission of which would tend to mislead or deceive consumers, including Plaintiffs and the North Carolina Class members;

(i) Defendant made material representations and statements of fact to Plaintiffs and the North Carolina Class members that resulted in them reasonably believing the represented or suggested state of affairs to be other than what they actually were;

(j) Defendant intended that Plaintiffs and the North Carolina Class members rely on their misrepresentations and omissions, so that they would purchase the Vehicles; and

(k) Under all of these circumstances, Defendant's conduct in employing these unfair and deceptive trade practices was

malicious, willful, wanton and outrageous such as to shock the conscience of the community and warrant the imposition of punitive damages.

519. The conduct of Defendant was likely to mislead consumers and Defendant intended that Plaintiffs and the North Carolina Class members rely on their misrepresentations.

520. The conduct of Defendant offends established public policy and is immoral, unethical, oppressive, unscrupulous and substantially injurious to consumers.

521. The foregoing acts, omissions and practices proximately caused Plaintiffs and the North Carolina Class members to suffer an ascertainable loss in the form of, inter alia, overpayment and diminution in value of the Vehicles, and Plaintiffs and the North Carolina Class members are entitled to recover such damages, together with appropriate exemplary damages, attorneys' fees and costs of suit.

522. Plaintiffs further seek an order enjoining Defendant's unfair or deceptive acts or practices.

**H. Claims brought on behalf of the Texas Subclass**

**<u>TWENTY FIRST CAUSE OF ACTION</u>**

**Violations of the Deceptive Trade Practices Act**

**(TEX. BUS. & COM. CODE §§ 17.41, ET SEQ.)**

523. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

524. Plaintiff Cox brings this Count on behalf of the Texas Class.

525. Plaintiff and General Motors are each "persons" as defined by Tex. Bus. & Com. Code § 17.45(3).

526. The Vehicles are "goods" under Tex. Bus. & Com. Code § 17.45(1).

527. Plaintiff and the other Texas Class members are "consumers" as defined in Tex. Bus. & Com. Code § 17.45(4).

528.  General Motors has at all relevant times engaged in "trade" and "commerce" as defined in Tex. Bus. & Com. Code § 17.45(6), by advertising, offering for sale, selling, leasing, and/or distributing the Vehicles in Texas, directly or indirectly affecting Texas citizens through that trade and commerce.

529. The allegations set forth herein constitute false, misleading, or deceptive trade acts or practices in violation of Texas's Deceptive Trade Practices-Consumer Protection Act ("DTPA"), Tex. Bus. & Com. Code §§ 17.41, et seq.

530. By failing to disclose and actively concealing the defects in the CUEs in the Vehicles, General Motors engaged in deceptive business practices prohibited by the DTPA, including engaging in acts or practices which are unfair, misleading, false, or deceptive to the consumer.

531. General Motors knew that the CUEs in the Vehicles were defectively manufactured, would fail without warning, and were not suitable for their intended use. General Motors nevertheless failed to warn Plaintiff and the other Texas Class members about these defects despite having a duty to do so.

532. General Motors owed Plaintiff and the other Texas Class members a duty to disclose the defective nature of the CUEs in the Vehicles, because General Motors:

    (a)  Possessed exclusive knowledge of the defects rendering the Vehicles more unreliable than similar vehicles;

    (b)  Intentionally concealed the defects associated with the CUEs; and/or

    (c)  Made incomplete representations about the characteristics and performance of the CUE generally, while purposefully withholding material facts from Plaintiff and the other Texas Class members that contradicted these representations.

533. General Motors' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff, about the true performance and characteristics of the Vehicles' CUEs.

534. General Motors' intentional concealment of and failure to disclose the defective nature of the Vehicles to Plaintiff and the other Texas Class members constitutes an "unconscionable action or course of action" under Tex. Bus. & Com. Code § 17.45(5) because, to the detriment of Plaintiff and the other Texas Class members, that conduct took advantage of their lack of knowledge, ability, and experience to a grossly unfair degree. That "unconscionable action or course of action" was a producing cause of the economic damages sustained by Plaintiff and the other Texas Class members.

535. General Motors is also liable under Tex. Bus. & Com. Code § 17.50(a) because General Motors' breach of the implied warranty of merchantability set forth herein was a producing cause of economic damages sustained by Plaintiff and the other Texas Class members.

536. As a result of its violations of the DTPA detailed above, General Motors caused actual damage to Plaintiff and, if not stopped, will continue to harm Plaintiff. Plaintiff currently owns or leases, or within the class period has owned or leased, a Class Vehicle that is defective. Defects associated with the Vehicles' CUEs have caused the value of Vehicles to decrease.

537. All procedural prerequisites, including notice, have been met. The giving of notice to General Motors is rendered impracticable pursuant to Tex. Bus. & Com. Code § 17.505(b) and unnecessary because General Motors has notice of the claims against it through the numerous complaints filed against it. Pursuant to Tex. Bus. & Com. Code § 17.505(b), Plaintiff, individually and on behalf of the other Texas Class members, will send to the Texas Consumer Protection Division a copy of this Complaint.

538. Plaintiff and the other Texas Class members sustained damages as a result of the General Motors unlawful acts and are, therefore, entitled to damages and other relief as provided under the DTPA.

539. Plaintiff and the other Texas Class members should be awarded three

times the amount of their economic damages because General Motors intentionally concealed and failed to disclose the defective nature of the Vehicles.

## TWENTY SECOND CAUSE OF ACTION

**Breach of Implied Warranty**

**(BASED ON TEXAS LAW)**

540. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

541. Plaintiff brings this Count on behalf of the Texas Class.

542. General Motors is and was at all relevant times a merchant with respect to motor vehicles under Tex. Bus. & Com. Code § 2.104.

543. A warranty that the Vehicles were in merchantable condition was implied by law in the instant transactions, pursuant to Tex. Bus. & Com. Code § 2.314. These vehicles and the CUEs in the Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which they are used. Specifically, the Vehicles are inherently defective in that there are defects in the CUE which prevent users from enjoying many features of the Vehicles they purchased and/or leased and that they paid for; and the CUE was not adequately tested.

544. General Motors was provided notice of these issues by numerous complaints against it, including the instant Complaint, and by customer complaints, letters, emails and other communications from Class members and from dealers and other repair facilities.

545. As a direct and proximate result of General Motors' breach of the warranties of merchantability, Plaintiff and the other Texas Class members have been damaged in an amount to be proven at trial.

## TWENTY THIRD CAUSE OF ACTION

**Unjust Enrichment**

**(BASED ON TEXAS LAW)**

546. Plaintiff incorporates by reference all preceding allegations as though

fully set forth herein.

547. Plaintiff Cox brings this claim on behalf of the Texas Class.

548. General Motors has benefitted and been enriched by the conduct alleged herein. General Motors has generated substantial revenue from the unlawful conduct described herein. General Motors has knowledge and appreciation of this benefit, which was conferred upon it by and at the expense of Plaintiff and the other Texas Class members.

549. General Motors has voluntarily accepted and retained this benefit.

550. The circumstances, as described herein, are such that it would be inequitable for General Motors to retain the ill-gotten benefit without paying the value thereof to Plaintiff and the other Texas Class members.

551. Plaintiff and the other Texas Class members are entitled to the amount of General Motors' ill-gotten gains, including interest, resulting from their unlawful, unjust, unfair, and inequitable conduct as alleged herein.

## I. Claims brought on behalf of the Indiana Subclass

### TWENTY FOURTH CAUSE OF ACTION

### Violation of the Indiana Deceptive Consumer Sales Act

### Ind. Code §§ 24-5-0.5-3

552. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

553. Plaintiff Bradley brings this claim on behalf of the Indiana Class.

554. Defendant is a "person" within the meaning of Ind. Code § 24-5-0.5-2(2) and "suppliers" within the meaning of Ind. Code § 24-5-.05-2(a)(3).

555. Plaintiff and Indiana Sub-Class members' purchases of the Class Vehicles are "consumer transactions" within the meaning of Ind. Code § 24-5-.05-2(a)(1).

556. Indiana's Deceptive Consumer Sales Act ("Indiana DCSA") prohibits a person from engaging in a "deceptive trade practice," which includes representing:

"(1) That such subject of a consumer transaction has sponsorship, approval, performance, characteristics, accessories, uses, or benefits that they do not have, or that a person has a sponsorship, approval, status, affiliation, or connection it does not have; (2) That such subject of a consumer transaction is of a particular standard, quality, grade, style or model, if it is not and if the supplier knows or should reasonably know that it is not; … (7) That the supplier has a sponsorship, approval or affiliation in such consumer transaction that the supplier does not have, and which the supplier knows or should reasonably know that the supplier does not have; … (b) Any representations on or within a product or its packaging or in advertising or promotional materials which would constitute a deceptive act shall be the deceptive act both of the supplier who places such a representation thereon or therein, or who authored such materials, and such suppliers who shall state orally or in writing that such representation is true if such other supplier shall know or have reason to know that such representation was false."

557. In the course of their business, Defendant failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective CUEs installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Defendant also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the Class Vehicles and/or the CUEs installed in them

558. By failing to disclose and by actively concealing the Defect in the Class Vehicles and/or the Defective CUEs installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendant engaged in unfair or deceptive business practices in violation of the Indiana UTPA. Defendant deliberately withheld the information about the propensity of the CUEs to fail, in order to ensure that consumers would purchase

the Class Vehicles.

559. In the course of Defendant's business, they willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and serious defects discussed above. Defendant compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective CUEs installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

560. Defendant's unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead, tended to create a false impression in consumers, were likely to and did in fact deceive reasonable consumers, including Plaintiff, about the true safety and reliability of Class Vehicles and/or the Defective CUEs installed in them, the quality of Defendant's brands, and the true value of the Class Vehicles.

561. Defendant intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective CUEs installed in them with an intent to mislead Plaintiff and the Indiana Sub-Class.

562. Defendant knew or should have known that its conduct violated the Indiana DCSA.

563. As alleged above, Defendant made material statements about the safety and reliability of the Class Vehicles and/or the Defective CUEs installed in them that were either false or misleading.

564. To protect its profits and to avoid remediation costs and a public relations nightmare, Defendant concealed the dangers and risks posed by the Class Vehicles and/or the Defective CUEs installed in them and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles and allowed them to continue driving dangerous vehicles.

565. Defendant owed Plaintiff a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective CUE installed in them because Defendant:

(a) Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

(b) intentionally concealed the foregoing from Plaintiff; and/or

(c) Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiff that contradicted these representations.

566. Because Defendant fraudulently concealed the Defect in Class Vehicles and/or the Defective CUE installed in them the value of the Class Vehicles has greatly diminished. In light of the stigma attached to Class Vehicles by Defendant's conduct, they are now worth significantly less than they otherwise would be.

567. Defendant's failure to disclose and active concealment of the dangers and risks posed by the Defective CUEs in Class Vehicles were material to Plaintiff and the Indiana Sub-Class. A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

568. Plaintiff and the Indiana Sub-Class suffered ascertainable loss caused by Defendant's misrepresentations and their failure to disclose material information. Had they been aware of the Defect that existed in the Class Vehicles and/or the Defective CUEs installed in them, and Defendant's complete disregard for safety, Plaintiff either would have paid less for the vehicles or would not have purchased or leased them at all. Plaintiff did not receive the benefit of their bargain as a result of Defendant's misconduct.

569. Defendant's violations present a continuing risk to Plaintiff, the Indiana Sub-Class, as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

570. As a direct and proximate result of Defendant's violations of the Indiana DCSA, Plaintiff and the Indiana Sub-Class have suffered injury-in-fact and/or actual

damage.

571. Pursuant to Ind. Code § 24-5-0.5-4, Plaintiffs and the Indiana Sub-Class seek monetary relief against Defendant measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $500 for each Plaintiff and each Indiana Sub-Class member, including treble damages up to $1,000 for Defendant's willfully deceptive acts.

572. In accordance with Ind. Code § 24-5-0.5-5(a), Plaintiffs' counsel, on behalf of Plaintiff, served Defendant with notice of their "curable" alleged violations of the Indiana DCSA relating to the Class Vehicles and/or the Defective CUEs installed in them purchased by Plaintiff and the Indiana Sub-Class, and demanded that Defendant correct or agree to correct the actions described therein. If Defendant fail to do so, Plaintiff will amend this Complaint as of right (or otherwise seek leave to amend the Complaint) to include compensatory and monetary damages to which Plaintiff and Class Members are entitled. Plaintiff presently seeks full relief for Defendant's "incurable" acts.

573. Plaintiff further alleges that Defendant's malicious and deliberate conduct warrants an assessment of punitive damages because Defendant carried out despicable conduct with willful and conscious disregard of the rights and safety of others, subjecting Plaintiff and the Indiana Sub-Class to cruel and unjust hardship as a result. Defendant's intentionally and willfully misrepresented the safety and reliability of the Class Vehicles and/or the Defective CUEs installed in them, deceived Plaintiff and the Indiana Sub-Class and concealed material facts that only Defendant knew, all to avoid the expense and public relations nightmare of correcting a flaw in the Class Vehicles and/or the Defective CUE installed in them. Defendant's unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.  Plaintiff further seek an order enjoining Defendant's unfair or deceptive acts or practices.

//

//

### **TWENTY FIFTH CAUSE OF ACTION**

### **Breach of the Implied Warranty of Merchantability**

### **Ind. Code §§ 26 et seq.**

574. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

575. Plaintiff Bradley brings this claim on behalf of the Indiana Class.

576. General Motors is and was at all relevant times a merchant with respect to motor vehicles within the meaning of Ind. Code § 26-1-2-104(1).

577. A warranty that the Class Vehicles and/or the Defective CUEs installed in them were in merchantable condition was implied by law in Class Vehicle transactions, pursuant to Ind. Code § 26-1-2-314.

578. The Class Vehicles and/or the defective CUEs installed in them, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars and infotainment systems are used.

579. Defendant was provided notice of these issues by their knowledge of the issues, by customer complaints, by numerous complaints filed against them and/or others, by internal investigations, and by numerous individual letters and communications sent by the consumers.

580. As a direct and proximate result of Defendant's breach of the warranties of merchantability, Plaintiff and the Indiana Sub-Class have been damaged in an amount to be proven at trial.

### **TWENTY SIXTH CAUSE OF ACTION**

### **Unjust Enrichment**

### **(BASED ON INDIANA LAW)**

581. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

582. Plaintiff Bradley brings this claim on behalf of the Indiana Class.

583. General Motors has benefitted and been enriched by the conduct alleged

herein. General Motors has generated substantial revenue from the unlawful conduct described herein. General Motors has knowledge and appreciation of this benefit, which was conferred upon it by and at the expense of Plaintiff and the other Indiana Class members.

584. General Motors has voluntarily accepted and retained this benefit.

585. The circumstances, as described herein, are such that it would be inequitable for General Motors to retain the ill-gotten benefit without paying the value thereof to Plaintiff and the other Indiana Class members.

586. Plaintiff and the other Indiana Class members are entitled to the amount of General Motors' ill-gotten gains, including interest, resulting from their unlawful, unjust, unfair, and inequitable conduct as alleged herein.

## J.  Claims brought on behalf of the Iowa Subclass

### TWENTY SEVENTH CAUSE OF ACTION

### Violation of the Private Right of Action for Consumer Frauds Act

### Iowa Code § 714H.1, et seq.

587. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

588. General Motors is a "person" under Iowa Code § 714H.2(7).

589. Plaintiff Reeves and the Iowa Consumer Sub-Class are "consumers," as defined by Iowa Code § 714H.2(3).

590. The Iowa Private Right of Action for Consumer Frauds Act ("Iowa CFA") prohibits any "practice or act the person knows or reasonably should know is an unfair practice, deception, fraud, false pretense, or false promise, or the misrepresentation, concealment, suppression, or omission of a material fact, with the intent that others rely upon the unfair practice, deception, fraud, false pretense, false promise, misrepresentation, concealment, suppression, or omission in connection with the advertisement, sale, or lease of consumer merchandise." Iowa Code § 714H.3. General Motors participated in misleading, false, or deceptive acts that violated the

Iowa CFA.

591. In the course of their business, Defendant failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective CUEs installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Defendant also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the Class Vehicles and/or the CUEs installed in them

592. By failing to disclose and by actively concealing the Defect in the Class Vehicles and/or the Defective CUEs installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendant engaged in unfair or deceptive business practices in violation of the Iowa CFA. Defendant deliberately withheld the information about the propensity of the CUEs to fail, in order to ensure that consumers would purchase the Class Vehicles.

593. In the course of Defendant's business, they willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and serious defects discussed above. Defendant compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective CUEs installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

594. Defendant's unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead, tended to create a false impression in consumers, were likely to and did in fact deceive reasonable consumers, including Plaintiff, about the true safety and reliability of Class Vehicles and/or the Defective CUEs installed in them, the quality of Defendant's brands, and the true value of the Class Vehicles.

595. Defendant's intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective CUEs installed in them with an intent to mislead Plaintiff and the Iowa Sub-Class.

596. Defendant knew or should have known that its conduct violated the Iowa CFA.

597. As alleged above, Defendant made material statements about the safety and reliability of the Class Vehicles and/or the Defective CUEs installed in them that were either false or misleading.

598. To protect its profits and to avoid remediation costs and a public relations nightmare, Defendant concealed the dangers and risks posed by the Class Vehicles and/or the Defective CUEs installed in them and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles and allowed them to continue driving dangerous vehicles.

599. Defendant owed Plaintiff a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective CUE installed in them because Defendant:

    (a)  Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

    (b)  intentionally concealed the foregoing from Plaintiff; and/or

    (c)  Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiff that contradicted these representations.

600. Because Defendant fraudulently concealed the Defect in Class Vehicles and/or the Defective CUE installed in them the value of the Class Vehicles has greatly diminished. In light of the stigma attached to Class Vehicles by Defendant's conduct, they are now worth significantly less than they otherwise would be.

601. Defendant's failure to disclose and active concealment of the dangers and risks posed by the Defective CUEs in Class Vehicles were material to Plaintiff and the Iowa Sub-Class. A vehicle made by a reputable manufacturer of safe vehicles is worth

more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

602. Plaintiff and the Iowa Sub-Class suffered ascertainable loss caused by Defendant's misrepresentations and their failure to disclose material information. Had they been aware of the CUE Defect that existed in the Class Vehicles and/or the Defective CUEs installed in them, and Defendant's complete disregard for safety, Plaintiff either would have paid less for the vehicles or would not have purchased or leased them at all. Plaintiff did not receive the benefit of their bargain as a result of Defendant's misconduct.

603. Defendant's violations present a continuing risk to Plaintiff, the Iowa Sub-Class, as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

604. As a direct and proximate result of Defendant's violations of the Pursuant to Iowa Code § 714H.5, Plaintiff and the Iowa Consumer Sub-Class seek to recover actual damages in an amount to be determined at trial; treble damages for Defendant's knowing violations of the Iowa CFA; an order enjoining Defendant's unfair, unlawful, and/or deceptive practices; declaratory relief; attorneys' fees; and any other just and proper relief available under the Iowa CFA, Plaintiff and the Iowa  Sub-Class have suffered injury-in-fact and/or actual damage.

605. Pursuant to Iowa Code § 714H.5, Plaintiff and the Iowa Sub-Class seek to recover actual damages in an amount to be determined at trial; treble damages for Defendant's knowing violations of the Iowa CFA; an order enjoining Defendant's unfair, unlawful, and/or deceptive practices; declaratory relief; attorneys' fees; and any other just and proper relief available under the Iowa CFA.

606. Plaintiff further alleges that Defendant's malicious and deliberate conduct warrants an assessment of punitive damages because Defendant carried out despicable conduct with willful and conscious disregard of the rights and safety of others, subjecting Plaintiff and the Iowa Sub-Class to cruel and unjust hardship as a

result. Defendant's intentionally and willfully misrepresented the safety and reliability of the Class Vehicles and/or the Defective CUEs installed in them, deceived Plaintiff and the Iowa Sub-Class and concealed material facts that only Defendant knew, all to avoid the expense and public relations nightmare of correcting a flaw in the Class Vehicles and/or the Defective CUE installed in them. Defendant's unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.  Plaintiff further seek an order enjoining Defendant's unfair or deceptive acts or practices.

## TWENTY EIGHTH CAUSE OF ACTION

### Breach of Implied Warranty of Merchantability

### IOWA CODE §§ 554.2 et seq.

607. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

608. Plaintiff Reeves brings this claim on behalf of the Iowa Sub-Class.

609. General Motors is and was at all relevant times a merchant with respect to motor vehicles within the meaning of Iowa Code Ann. § 554.2104.

610. A warranty that the Class Vehicles and/or the Defective CUEs installed in them were in merchantable condition was implied by law in Class Vehicle transactions, pursuant to Iowa Code Ann. § 554.2314.

611. The Class Vehicles and/or the defective CUEs installed in them, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars and infotainment systems are used.

612. Defendant was provided notice of these issues by their knowledge of the issues, by customer complaints, by numerous complaints filed against them and/or others, by internal investigations, and by numerous individual letters and communications sent by the consumers.

613. As a direct and proximate result of Defendant's breach of the warranties of merchantability, Plaintiff and the Iowa Sub-Class have been damaged in an amount to be proven at trial.

## TWENTY NINTH CAUSE OF ACTION

### Unjust Enrichment

### (BASED ON IOWA LAW)

614. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

615. Plaintiff Reeves brings this claim on behalf of the Iowa Sub-Class.

616. General Motors has benefitted and been enriched by the conduct alleged herein. General Motors has generated substantial revenue from the unlawful conduct described herein. General Motors has knowledge and appreciation of this benefit, which was conferred upon it by and at the expense of Plaintiff and the other Iowa Sub-Class members.

617. General Motors has voluntarily accepted and retained this benefit.

618. The circumstances, as described herein, are such that it would be inequitable for General Motors to retain the ill-gotten benefit without paying the value thereof to Plaintiff and the other Iowa Sub-Class members.

619. Plaintiff and the other Iowa Sub-Class members are entitled to the amount of General Motors' ill-gotten gains, including interest, resulting from their unlawful, unjust, unfair, and inequitable conduct as alleged herein.

### K. Claims brought on behalf of the New York Subclass

## THIRTIETH CAUSE OF ACTION

### Violations of New York General Business Law § 349

### (N.Y. GEN. BUS. LAW § 349)

620. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

621. Plaintiff Kladke brings this claim on behalf of the New York Sub-Class.

622. New York's General Business Law § 349 makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce."

623. In the course of General Motors' business, it willfully failed to disclose

and actively concealed the dangerous risk of CUE failure in Class Vehicles as described above. Accordingly, General Motors engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices as defined in N.Y. Gen. Bus. Law § 349, including engaging in conduct likely to deceive.

624. General Motors' actions as set forth above occurred in the conduct of trade or commerce.

625. Because General Motors' deception takes place in the context of automobile safety, its deception affects the public interest. Further, General Motors' unlawful conduct constitutes unfair acts or practices that have the capacity to deceive consumers, and that have a broad impact on consumers at large.

626. General Motors' conduct proximately caused injuries to Plaintiff and the other Class members.

627. Plaintiff and the other Class members were injured as a result of General Motors' conduct in that Plaintiff and the other Class members overpaid for their Class Vehicles and did not receive the benefit of their bargain, and their Class Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of General Motors' misrepresentations and omissions.

## THIRTY FIRST CAUSE OF ACTION

### Violations of New York General Business Law § 350

### (N.Y. GEN. BUS. LAW § 350)

628. Plaintiff incorporate by reference all preceding allegations as though fully set forth herein.

629. Plaintiff Kladke brings this Count on behalf of the New York Class.

630. New York's General Business Law § 350 makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce[.]" False advertising includes "advertising, including labeling, of a commodity … if such advertising is misleading in a material respect," taking into account "the extent to which the

advertising fails to reveal facts material in the light of …representations [made] with respect to the commodity….” N.Y. Gen. Bus. Law § 350-a.

631. General Motors caused to be made or disseminated through New York, through advertising, marketing, and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to General Motors, to be untrue and misleading to consumers, including Plaintiff and the other Class members.

632. General Motors has violated N.Y. Gen. Bus. Law § 350 because the omissions regarding the dangerous risk of CUE failure in Class Vehicles as described above, as well as the inherently defective nature of the CUE as designed and sold by General Motors, and the loss of communications and entertainment functionality as described above, were material and likely to deceive a reasonable consumer.

633. Plaintiff and the other Class members have suffered injury, including the loss of money or property, as a result of General Motors false advertising. In purchasing or leasing their Class Vehicles, Plaintiff and the other Class members relied on the representations and/or omissions of General Motors with respect to the safety, quality, functionality, and reliability of the Class Vehicles. General Motors’ representations turned out to be untrue because the CUEs installed in Class Vehicles are prone to total system failures, diminished or completely inoperable functionality, and other failures as described hereinabove. Had Plaintiff and the other Class members known this, they would not have purchased or leased their Class Vehicles and/or paid as much for them.

634. Accordingly, Plaintiff and the other Class members overpaid for their Class Vehicles and did not receive the benefit of the bargain for their Class Vehicles, which have also suffered diminution in value.

635. Plaintiff, individually and on behalf of the other Class members, request that this Court enter such orders or judgments as may be necessary to enjoin General Motors from continuing its unfair, unlawful and/or deceptive practices. Plaintiff and

the other Class members are also entitled to recover their actual damages or $500, whichever is greater. Because General Motors acted willfully or knowingly, Plaintiff and the other Class members are entitled to recover three times actual damages, up to $10,000.

## THIRTY SECOND CAUSE OF ACTION

### Breach of Implied Warranty

### (N.Y. U.C.C. LAW § 2-315)

636. Plaintiff incorporate by reference all preceding allegations as though fully set forth herein.

637. Plaintiff Kladke brings this claim on behalf of the New York Class.

638. General Motors marketed the Vehicles as safe and reliable luxury vehicles. Such representations formed the basis of the bargain in Plaintiff's and the other New York Class members' decisions to purchase the Vehicles.

639. General Motors was at all relevant times a "merchant" of motor vehicles as defined by N.Y. U.C.C. Law § 2-104.

640. In connection with the purchase or lease of each of the Vehicles, General Motors provided bumper to bumper warranty coverage for the Vehicles for four years or 50,000 miles, which obliges General Motors to repair or replace any part that is defective under normal use.

641. General Motors' warranty formed a basis of the bargain that was reached when Plaintiff and the other New York Class members purchased their Vehicles.

642. Plaintiff and the other New York Class members owned Vehicles with defective CUEs within the warranty period but had no knowledge of the existence of the defect, which was known and concealed by General Motors.

643. Despite the existence of the warranty, General Motors failed to inform Plaintiff and the other New York Class members that the Vehicles contained the defective infotainment systems during the warranty periods.

644. General Motors breached the express warranty promising to repair and

correct a manufacturing defect or defect in materials or workmanship of any parts they supplied.

645. General Motors knew about the defect in the infotainment system, allowing General Motors to cure their breach of its warranty if it chose.

646. However, General Motors concealed the defect and has refused to repair or replace the CUEs despite the defect's existence at the time of sale or lease of the Vehicles.

647. Any attempt by General Motors to disclaim or limit recovery to the terms of the express warranties is unconscionable and unenforceable here. Specifically, General Motors' warranty limitation is unenforceable because they knowingly sold or leased a defective product without informing consumers about the defect. The time limits contained in General Motors' warranty periods were also unconscionable and inadequate to protect Plaintiff and the other New York Class members. Among other things, Plaintiff and the other New York Class members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored General Motors. A gross disparity in bargaining power existed between General Motors and other New York Class members, and General Motors knew that the CUEs were defective at the time of sale.

648. Further, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiff and the other New York Class members whole because the replacement part used by General Motors contains the same defect. Affording General Motors, a reasonable opportunity to cure the breach of written warranties therefore would be unnecessary and futile.

649. Accordingly, General Motors is liable to Plaintiff and the other New York Class members for damages in an amount to be proven at trial.

//

//

## THIRTY THIRD CAUSE OF ACTION

### Fraudulent Concealment

### (BASED ON NEW YORK LAW)

650. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

651. Plaintiff Kladke bring this claim on behalf of the New York Class.

652. General Motors intentionally concealed that the CUE is defective.

653. General Motors further affirmatively misrepresented to Plaintiff in advertising and other forms of communication, including standard and uniform material provided with each car and on its website, that the Vehicles it was selling had no significant defects, that the CUE was a safety feature, reliable, and would perform and operate properly.

654. General Motors knew about the defect in the CUE when these representations were made.

655. The Vehicles purchased by Plaintiff and the other New York Class members contained a defective CUE.

656. General Motors had a duty to disclose that the CUE contained a fundamental defect as alleged herein, because the defect created a safety hazard and Plaintiff and the other New York Class members relied on General Motors' material representations.

657. As alleged herein, at all relevant times, General Motors has held out the Vehicles to be free from defects such as the defect related to the CUE. General Motors touted and continues to tout the many benefits and advantages of the CUE, but nonetheless failed to disclose important facts related to the defect. This made General Motors' other disclosures about the CUE deceptive.

658. The truth about the defective CUE was known only to General Motors; Plaintiff and the other New York Class members did not know of these facts and General Motors actively concealed these facts from Plaintiff and the other New York

1   Class members.

2       659. Plaintiff and the other New York Class members reasonably relied upon

3   General Motors' deception. They had no way of knowing that General Motors'

4   representations were false, misleading, or incomplete. As consumers, Plaintiff and the

5   other New York Class members did not, and could not, unravel General Motors'

6   deception on their own. Rather, General Motors intended to deceive Plaintiff and New

7   York Class members.

8       660. General Motors' false representations and omissions were material to

9   consumers because they concerned qualities of the Vehicles that played a significant

10  role in the value of the Vehicles.

11      661. General Motors had a duty to disclose the Defect and violations with

12  respect to the Vehicles because details of the true facts were known and/or accessible

13  only to General Motors, because General Motors had exclusive knowledge as to such

14  facts, and because General Motors knew these facts were not known to or reasonably

15  discoverable by Plaintiff or the other New York Class members.

16      662. General Motors also had a duty to disclose because it made general

17  affirmative representations about the technological and safety innovations included

18  with its Vehicles, without telling consumers that one of the features had a fundamental

19  defect that would affect the safety, quality and performance of the Vehicles.

20      663. General Motors' disclosures were misleading, deceptive, and incomplete

21  because they failed to inform consumers of the additional facts regarding the defect in

22  the CUE as set forth herein. These omitted and concealed facts were material because

23  they directly impact the value of the Vehicles purchased by Plaintiff and the other

24  New York Class members.

25      664. General Motors has still not made full and adequate disclosures and

26  continues to defraud Plaintiff and the other New York Class members by concealing

27  material information regarding the defect in the CUE.

28      665. Plaintiff and the other New York Class members were unaware of the

omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased or leased or paid as much for cars with faulty technology, and/or would have taken other affirmative steps in light of the information concealed from them. Plaintiff's and the other New York Class members' actions were justified. General Motors was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiff, or the other New York Class members.

666. Because of the concealment and/or suppression of facts, Plaintiff and the other New York Class members sustained damage because they own(ed) vehicles that are diminished in value as a result of General Motors' concealment of the true quality of those vehicles' CUEs. Had Plaintiff and the other New York Class members been aware of the defect in the CUEs installed in the Vehicles, and General Motors' disregard for the truth, Plaintiff and the other New York Class members who purchased a Vehicle would have paid less for them or would not have purchased them at all.

667. The value of Plaintiff's and the other New York Class members' Vehicles has diminished as a result of General Motors' fraudulent concealment of the defective CUE of the Vehicles, which has made any reasonable consumer reluctant to purchase any of the Vehicles, let alone pay what otherwise would have been fair market value for the Vehicles.

668. Accordingly, General Motors is liable to Plaintiff and the other New York Class members for damages in an amount to be proven at trial.

669. General Motors' acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and the other New York Class members' rights and the representations that General Motors made to them, in order to enrich General Motors. General Motors' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## THIRTY FOURTH CAUSE OF ACTION

### Unjust Enrichment

### (BASED ON NEW YORK LAW)

670. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

671. Plaintiff Kladke brings this claim on behalf of the New York Sub-Class.

672. General Motors has benefitted and been enriched by the conduct alleged herein. General Motors has generated substantial revenue from the unlawful conduct described herein. General Motors has knowledge and appreciation of this benefit, which was conferred upon it by and at the expense of Plaintiff and the other New York Sub-Class members.

673. General Motors has voluntarily accepted and retained this benefit.

674. The circumstances, as described herein, are such that it would be inequitable for General Motors to retain the ill-gotten benefit without paying the value thereof to Plaintiff and the other New York Sub-Class members.

675. Plaintiff and the other New York Sub-Class members are entitled to the amount of General Motors' ill-gotten gains, including interest, resulting from their unlawful, unjust, unfair, and inequitable conduct as alleged herein.

### L. Claims brought on behalf of the West Virginia Subclass

## THIRTY FIFTH CAUSE OF ACTION

### Violation of the Consumer Credit and Protection Act

### W. Va. Code §§ 46A-1-101, *et seq.*

676. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

677. General Motors is a "person" under W. Va. Code § 46A-1-102(31).

678. Plaintiff and the West Virginia Sub-Class are "consumers," as defined by W. Va. Code §§ and 46A-1-102(12) and 46A-6-102(2), who purchased or leased one or more Class Vehicles with the Defective CUEs installed in them.

679. Defendants engaged in trade or commerce as defined by W. Va. Code § 46A-6 102(6).

680. The West Virginia Consumer Credit and Protection Act ("West Virginia CCPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce …." W. Va. Code § 46A-6-104. Without limitation, "unfair or deceptive" acts or practices include: (I) Advertising goods or services with intent not to sell them as advertised; (K) Making false or misleading statements of fact concerning the reasons for, existence of or amounts of price reductions; (L) Engaging in any other conduct which similarly creates a likelihood of confusion or of misunderstanding; (M) The act, use or employment by any person of any deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any goods or services, whether or not any person has in fact been misled, deceived or damaged thereby; (N) Advertising, printing, displaying, publishing, distributing or broadcasting, or causing to be advertised, printed, displayed, published, distributed or broadcast in any manner, any statement or representation with regard to the sale of goods or the extension of consumer credit including the rates, terms or conditions for the sale of such goods or the extension of such credit, which is false, misleading or deceptive or which omits to state material information which is necessary to make the statements therein not false, misleading or deceptive. W. Va. Code § 46A-6-102(7).

681. In the course of their business, Defendant failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective CUEs installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Defendant also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the Class

Vehicles and/or the CUEs installed in them

682. By failing to disclose and by actively concealing the Defect in the Class Vehicles and/or the Defective CUEs installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendant engaged in unfair or deceptive business practices in violation of the West Virginia CCPA. Defendant deliberately withheld the information about the propensity of the CUEs to fail, in order to ensure that consumers would purchase the Class Vehicles.

683. In the course of Defendant's business, they willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and serious defects discussed above. Defendant compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective CUEs installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

684. Defendant's unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead, tended to create a false impression in consumers, were likely to and did in fact deceive reasonable consumers, including Plaintiff, about the true safety and reliability of Class Vehicles and/or the Defective CUEs installed in them, the quality of Defendant's brands, and the true value of the Class Vehicles.

685. Defendant's intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective CUEs installed in them with an intent to mislead Plaintiff and the West Virginia Sub-Class.

686. Defendant knew or should have known that its conduct violated the West Virginia CCPA.

687. As alleged above, Defendant made material statements about the safety and reliability of the Class Vehicles and/or the Defective CUEs installed in them that were either false or misleading.

688. To protect its profits and to avoid remediation costs and a public relations nightmare, Defendant concealed the dangers and risks posed by the Class Vehicles and/or the Defective CUEs installed in them and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles and allowed them to continue driving dangerous vehicles.

689. Defendant owed Plaintiff a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective CUE installed in them because Defendant:

    (a) Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

    (b) intentionally concealed the foregoing from Plaintiff; and/or

    (c) Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiff that contradicted these representations.

690. Because Defendant fraudulently concealed the Defect in Class Vehicles and/or the Defective CUE installed in them the value of the Class Vehicles has greatly diminished. In light of the stigma attached to Class Vehicles by Defendant's conduct, they are now worth significantly less than they otherwise would be.

691. Defendant's failure to disclose and active concealment of the dangers and risks posed by the Defective CUEs in Class Vehicles were material to Plaintiff and the West Virginia Sub-Class. A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

692. Plaintiff and the West Virginia Sub-Class suffered ascertainable loss caused by Defendant's misrepresentations and their failure to disclose material information. Had they been aware of the Defect that existed in the Class Vehicles and/or the Defective CUEs installed in them, and Defendant's complete disregard for safety, Plaintiff either would have paid less for the vehicles or would not have

purchased or leased them at all. Plaintiff did not receive the benefit of their bargain as a result of Defendant's misconduct.

693. Defendant's violations present a continuing risk to Plaintiff, the West Virginia Sub-Class, as well as to the general public. Defendant's unlawful acts and practices complained of herein affect the public interest.

694. Pursuant to W. Va. Code § 46A-1-106, Plaintiffs seek monetary relief against Defendants measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $200 per violation of the West Virginia CCPA for each Plaintiff and each member of the West Virginia Sub-Class they seek to represent.

695. Plaintiff further alleges that Defendant's malicious and deliberate conduct warrants an assessment of punitive damages because Defendant carried out despicable conduct with willful and conscious disregard of the rights and safety of others, subjecting Plaintiff and the West Virginia Sub-Class to cruel and unjust hardship as a result. Defendant's intentionally and willfully misrepresented the safety and reliability of the Class Vehicles and/or the Defective CUEs installed in them, deceived Plaintiff and the West Virginia Sub-Class and concealed material facts that only Defendant knew, all to avoid the expense and public relations nightmare of correcting a flaw in the Class Vehicles and/or the Defective CUE installed in them. Defendant's unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.  Plaintiff further seek an order enjoining Defendant's unfair or deceptive acts or practices.

## THIRTY SIXTH CAUSE OF ACTION

### Breach of the Implied Warranty of Merchantability

### W. Va. Code § 46-2-314

696. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

697. General Motors is and was at all relevant times merchants with respect to

motor vehicles and/or CUEs within the meaning of W. Va. Code § 46A-6-107 and § 46-2-314.

698. A warranty that the Class Vehicles and/or the Defective CUEs installed in them were in merchantable condition was implied by law in Class Vehicle transactions, pursuant to W. Va. Code § 46-2-314.

699. The Class Vehicles and/or the defective CUEs installed in them, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars and infotainment systems are used.

700. Defendant was provided notice of these issues by their knowledge of the issues, by customer complaints, by numerous complaints filed against them and/or others, by internal investigations, and by numerous individual letters and communications sent by the consumers.

701. As a direct and proximate result of Defendant's breach of the warranties of merchantability, Plaintiff and the West Virginia Sub-Class have been damaged in an amount to be proven at trial.

## THIRTY SEVENTH CAUSE OF ACTION

### Unjust Enrichment

### (BASED ON WEST VIRGINIA LAW)

702. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

703. Plaintiff Conroe brings this claim on behalf of the West Virginia Sub-Class.

704. General Motors has benefitted and been enriched by the conduct alleged herein. General Motors has generated substantial revenue from the unlawful conduct described herein. General Motors has knowledge and appreciation of this benefit, which was conferred upon it by and at the expense of Plaintiff and the other West Virginia Sub-Class members.

705. General Motors has voluntarily accepted and retained this benefit.

706. The circumstances, as described herein, are such that it would be inequitable for General Motors to retain the ill-gotten benefit without paying the value thereof to Plaintiff and the other West Virginia Sub-Class members.

707. Plaintiff and the other West Virginia Sub-Class members are entitled to the amount of General Motors' ill-gotten gains, including interest, resulting from their unlawful, unjust, unfair, and inequitable conduct as alleged herein.

**M. Claims brought on behalf of the Kansas Subclass**

**THIRTY EIGHTH CAUSE OF ACTION**

**Violations of the Kansas Consumer Protection Act**

**(Kan. Stat. Ann. § 50-623, et seq.)**

708. Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

709. Plaintiff John Toda bring this action on behalf of themselves and the Kansas Class against Defendant.

710. General Motors is a "supplier" under the Kansas Consumer Protection Act ("Kansas CPA"), Kan. Stat. Ann. § 50-624(l)

711. Kansas Class members are "consumers," within the meaning of Kan. Stat. Ann. § 50-624(b), who purchased or leased one or more Class Vehicles.

712. The sale of the Class Vehicles to the Kansas Class members was a "consumer transaction" within the meaning of Kan. Stat. Ann. § 50-624(c).

713. The Kansas CPA states "[n]o supplier shall engage in any deceptive act or practice in connection with a consumer transaction," Kan. Stat. Ann. § 50-626(a), and that deceptive acts or practices include: (1) knowingly making representations or with reason to know that "(A) Property or services have sponsorship, approval, accessories, characteristics, ingredients, uses, benefits or quantities that they do not have;" and "(D) property or services are of particular standard, quality, grade, style or model, if they are of another which differs materially from the representation;" "(2) the willful use, in any oral or written representation, of exaggeration, falsehood,

innuendo or ambiguity as to a material fact;" and "(3) the willful failure to state a material fact, or the willful concealment, suppression or omission of a material fact." The Kansas CPA also provides that "[n]o supplier shall engage in any unconscionable act or practice in connection with a consumer transaction." Kan. Stat. Ann. § 50-627(a).

714. In the course of their business, Defendant concealed and suppressed material facts concerning the Class Vehicles. Defendant accomplished this by installing a defective CUE. Plaintiff and Kansas Class members did not and could not unravel Defendant's deception on their own.

715. Defendant thus violated the Act by, at minimum: (1) representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Class Vehicles are of a particular standard and quality when they are not; (3) advertising the Class Vehicles with the intent not to sell them as advertised; (4) willfully using, in any oral or written representation, of exaggeration, falsehood, innuendo or ambiguity as to a material fact; (5) willfully failing to state a material fact, or the willfully concealing, suppressing or omitting a material fact; and (6) otherwise engaging in an unconscionable act or practice in connection with a consumer transaction.

716. Defendant's actions as set forth above occurred in the conduct of trade or commerce.

717. Defendant engaged in misleading, false, unfair or deceptive acts or practices that violated the Kansas CPA by installing, failing to disclose and actively concealing the defective CUEs and by marketing its vehicles as reliable, safe, and of high quality, and by presenting itself as a reputable manufacturer that valued safety and that stood behind its vehicles after they were sold.

718. Defendant intentionally and knowingly misrepresented material facts regarding the Class Vehicles with intent to mislead Plaintiff and the Kansas Class.

719. Defendant knew or should have known that its conduct violated the

Kansas CPA

720. Defendant owed Plaintiff a duty to disclose the Defect and the safety risks of the Class Vehicles because they:

   (a)   possessed exclusive knowledge that they were manufacturing, selling, and distributing vehicles throughout the United States that had defective CUEs;

   (b)   made incomplete representations about the safety and reliability of the Class Vehicles generally, while purposefully withholding material facts from Plaintiff that contradicted these representations.

721. The value of the Class Vehicles has greatly diminished. In light of the stigma attached to those vehicles by Defendant's conduct, they are now worth significantly less than they otherwise would be worth.

722. Defendant's unfair or deceptive acts or practices were likely to and did in fact reasonable consumers, including Plaintiff, about the safety and reliability of Cadillac-branded vehicles, the quality of the Cadillac brand, and the true value of the Class Vehicles.

723. Plaintiff and the Kansas subclass suffered ascertainable loss and actual damages as a direct and proximate result of Defendant's misrepresentations and its concealment of and failure to disclose material information. Plaintiff and the Kansas subclass members who purchased or leased the Class Vehicles would not have purchased or leased them at all and/or—if the Vehicles' true nature had been disclosed and mitigated, would have paid significantly less for them. Plaintiff also suffered diminished value of their vehicles, as well as lost or diminished use.

724. Defendant had an ongoing duty to all Cadillac customers to refrain from unfair and deceptive practices under the Kansas CPA. All owners of Class Vehicles suffered ascertainable loss in the form of the diminished value of their vehicles as a result of Defendant's deceptive and unfair acts and practices made in the course of Defendant's business.

725. As a direct and proximate result of Defendant's violations of the Kansas CPA, Plaintiff and the Kansas Class have suffered injury-in-fact and/or actual damage.

726. Pursuant to Kan. Stat. Ann. § 50-634, Plaintiff and the Kansas Class seek monetary relief against Defendant measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $10,000 for each Plaintiff and each Kansas Class member

727. Plaintiff also seeks an order enjoining Defendant's unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under Kan. Stat. Ann § 50-623, et seq.

## THIRTY NINTH CAUSE OF ACTION

### Breach of Implied Warranty of Merchantability

### (Kan. Stat. §§ 84-2-314 and 84-2A-212)

728. Plaintiff realleges and incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

729. Plaintiffs bring this Count on behalf of the Kansas subclass, against Defendant

730. Defendant is and was at all relevant times a "merchant" with respect to motor vehicles under Kan. Stat. §§ 84-2-104(1) and 84-2A-103(3), and a "seller" of motor vehicles under § 84-2-103(1)(d).

731. With respect to leases, Defendant is and was at all relevant times "lessors" of motor vehicles under Kan. Stat. § 84-2A-103(1)(p).

732. The Class Vehicles are and were at all relevant times "goods" within the meaning of Kan. Stat. §§ 84-2-105(1) and 84-2A-103(1)(h).

733. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Kan. Stat. §§ 84-2-314 and 84-2A-212.

734. These Class Vehicles, when sold or leased and at all times thereafter,

were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are defective in that they contain the defective CUE, rendering the infotainment system and certain safety features inoperable.

735. Defendant was provided notice of these issues by the instant Complaint, and by numerous individual letters and communications sent by Plaintiff and others within a reasonable amount of time after the allegations of Class Vehicle defects became public.

736. As a direct and proximate result of Defendant's breach of the implied warranty of merchantability, Plaintiff and the other Kansas subclass members have been damaged in an amount to be proven at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and on behalf of the Class, respectfully requests that this Court enter an Order:

(1) Certifying the proposed Class, and appointing Plaintiffs as Class Representatives;

(2) Finding that Defendant's conduct was negligent, deceptive, unfair, and unlawful as alleged herein;

(3) Enjoining Defendant from engaging in further negligent, deceptive, unfair, and unlawful business practices as alleged herein;

(4) Awarding Plaintiffs and Class members actual, compensatory, and consequential damages;

(5) Awarding Plaintiffs and Class members restitution as appropriate;

(6) Forcing Defendant General Motors to disgorge all unlawful gains or unjust enrichment;

(7) Awarding Plaintiffs and Class members statutory damages and penalties, as allowed by law;

(8) Awarding Plaintiffs and Class members pre-judgment and post-judgment interest;

(9) Awarding Plaintiffs and Class members reasonable attorneys' fees, costs, and expenses; and

(10) Granting such other relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs, on behalf of themselves and the proposed Class, hereby demands a trial by jury as to all matters so triable.

Dated: September 4, 2019      **CASEY GERRY SCHENK FRANCAVILLA BLATT & PENFIELD, LLP**

By:    s/Gayle M. Blatt

GAYLE M. BLATT

*gmb@cglaw.com*

Attorneys for Plaintiff

Dated: September 4, 2019      **MOON LAW APC**

By:    s/ Christopher D. Moon

CHRISTOPHER D. MOON

*chris@moonlawapc.com*

Attorneys for Plaintiff

David S. Casey, Jr., SBN 060768
*dcasey@cglaw.com*
Gayle M. Blatt, SBN 122048
*gmb@cglaw.com*
Jeremy Robinson, SBN 188325
*jrobinson@cglaw.com*
P. Camille Guerra, SBN 326546
camille@cglaw.com
Seth Barron, SBN 325459
*sbarron@cglaw.com*
David S. Casey III, SBN 325599
*caseyd@cglaw.com*
**CASEY GERRY SCHENK
FRANCAVILLA BLATT & PENFIELD,
LLP**
110 Laurel Street
San Diego, CA  92101
Telephone: (619) 238-1811
Facsimile: (619) 544-9232

*Attorneys for Plaintiffs*

Christopher D. Moon, SBN 246622
*chris@moonlawapc.com*
Kevin O. Moon, SBN 246792
*kevin@moonlawapc.com*
**MOON LAW APC**
600 West Broadway, Suite 700
San Diego, California 92101
Telephone: (619) 915-9432
Facsimile: (650) 542-8432

# UNITED STATES DISTRICT COURT - CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **Cindy Uyenoyama; Vanessa Rodriguez; Benito Guzman; William Braden; Norman Ganon; Crystal Robinson; Maxine Glenn; Mariano Lorenzo Macaisa; Gini Michelle Cox; Shelia Cauthen; April Bradley; Richard Schellhammer; Shon Reeves; Earl Kladke; David Conroe;** and **John Toda** on behalf of themselves and a class of all others similarly situated <br> Plaintiffs, <br><br> v. <br><br> **General Motors, LLC,** <br><br> Defendant. | CASE NO. <br><br> **DECLARATION OF CINDY UYENOYAMA PURSUANT TO CALIFORNIA CIVIL CODE §1780** |

I, Cindy Uyenoyama, declare:

    1.  I am the named plaintiff and representative of the putative class in this case.

    2.  I purchased 2013 Cadillac ATS from the Crestview Cadillac dealership, which is a franchised and authorized Cadillac dealership located in West Covina, California.

    3.  At all relevant times for this litigation, I have resided in Los Angeles County, California.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on September 4, 2019, at Los Angeles, California.

*Cindy Uyenoyama*
Cindy Uyenoyama (Sep 4, 2019)

Cindy Uyenoyama

# EXHIBIT A



Bulletin No.: PIC6055

Date: Dec-2014

# Service Bulletin

## PRELIMINARY INFORMATION

**Subject:**  **Integrated Center Stack Display Delaminating Distorted Or Appears Cracked Behind Lens**

**Models:**  **2013-2014 Cadillac ATS, SRX, XTS**

**2014 Cadillac CTS VIN A, ELR**

**Equipped with Cadillac CUE 8 inch Touch Screen**

## Condition/Concern

Some customers may report that their radio screen appears bubbled, cracked, or is delaminating.

## Recommendation/Instructions

If this concern is encountered, replace the ICS (Integrated Center Stack) by following the SI replacement procedure.



## Parts Information

Use the latest part number available from your ESC (Electronic Service Center).

## Warranty Information

For vehicles repaired under warranty use:

| Labor Operation | Description | Labor Time |
|---|---|---|
| 3420700 | Radio Control Assembly Replacement   Radio Control Assembly Replacement | Use Published Labor Operation Time |

1

Please follow this diagnostic or repair process thoroughly and complete each step. If the condition exhibited is resolved without completing every step, the remaining steps do not need to be performed.

GM bulletins are intended for use by professional technicians, NOT a "do-it-yourselfer". They are written to inform these technicians of conditions that may occur on some vehicles, or to provide information that could assist in the proper service of a vehicle. Properly trained technicians have the equipment, tools, safety instructions, and know-how to do a job properly and safely. If a condition is described, DO NOT assume that the bulletin applies to your vehicle, or that your vehicle will have that condition. See your GM dealer for information on whether your vehicle may benefit from the information.



WE SUPPORT VOLUNTARY TECHNICIAN CERTIFICATION

# EXHIBIT B



Bulletin No.: PIC6055A

Date: Apr-2015

# Service Bulletin

## PRELIMINARY INFORMATION

**Subject:** **Integrated Center Stack Display Delaminating Or Appears Bubbled Behind Lens**

**Models:** **2013-2015 Cadillac ATS, SRX, XTS**

**2014-2015 Cadillac CTS VIN A, ELR**

**Equipped with Cadillac CUE 8 Inch Touch Screen**

*This PI was superseded to update Model Year and Recommendation/Instructions. Please discard PIC6055.*

## Condition/Concern

Customers may report their radio screen appears bubbled or is delaminating.

## Recommendation/Instructions

If this concern is encountered, replace the ICS (Integrated Center Stack) by following the SI replacement procedure.

**Note:** This PI only applies to delamination (see picture below). If the ICS was damaged by cleaning agents or excessive force please do not refer to the information in this PI.

2013-2014 model years, please contact your ESC and replace the ICS for this concern.

2015 model years, please contact GMTAC for authorization prior to contacting your ESC for an exchange ICS.



## Parts Information

Use the latest part number available from your ESC (Electronic Service Center).

## Warranty Information

For vehicles repaired under warranty use:

| Labor Operation | Description | Labor Time |
|---|---|---|
| 3420700 | Radio Control Assembly Replacement   Radio Control Assembly Replacement | Use Published Labor Operation Time |

**Additional SI Keywords:**

crack cracked

___

GM bulletins are intended for use by professional technicians, NOT a "do-it-yourselfer".  They are written to inform these technicians of conditions that may occur on some vehicles, or to provide information that could assist in the proper service of a vehicle.  Properly trained technicians have the equipment, tools, safety instructions, and know-how to do a job properly and safely.  If a condition is described, DO NOT assume that the bulletin applies to your vehicle, or that your vehicle will have that condition.  See your GM dealer for information on whether your vehicle may benefit from the information.

WE SUPPORT VOLUNTARY TECHNICIAN CERTIFICATION

# EXHIBIT C




**Bulletin No.: PIC6055B**

**Date: Oct-2016**



# Service Bulletin

## PRELIMINARY INFORMATION

**Subject:**    **Integrated Center Stack Display Delaminating Distorted Or Appears Bubbled Behind Lens**

**Models:**    **2013-2016 Cadillac ATS, SRX, XTS**

**2014-2016 Cadillac CTS VIN A, ELR, Escalade**

**Equipped with Cadillac CUE 8 Inch Touch Screen**

*This PI was superseded to update the Model Years and Recommendation section. Please discard PIC6055A.*

## Condition/Concern

Customers may report their radio screen appears bubbled or is delaminating.

## Recommendation/Instructions

If this concern is encountered, replace the ICS (Integrated Center Stack) by following the SI replacement procedure.

**Note:** THIS PI ONLY APPLIES TO THE TOUCH SCREEN  (see picture below). If the ICS was damaged by cleaning agents or excessive force do not refer to the information in this PI, please refer to the latest version of bulletin 08-08-44-015.

2013-2015 model years, please contact your ESC and replace the ICS for this concern.

2016 model years, please contact GMTAC for authorization prior to contacting your ESC for an exchange ICS.



## Parts Information

Use the latest part number available from your ESC (Electronic Service Center).

## Warranty Information

For vehicles repaired under warranty use:

1

| Labor Operation | Description | Labor Time |
|---|---|---|
| 3420700 | Radio Control Assemlby Replacement | Use Published Labor Operation Time |

GM bulletins are intended for use by professional technicians, NOT a "do-it-yourselfer".  They are written to inform these technicians of conditions that may occur on some vehicles, or to provide information that could assist in the proper service of a vehicle.  Properly trained technicians have the equipment, tools, safety instructions, and know-how to do a job properly and safely.  If a condition is described, DO NOT assume that the bulletin applies to your vehicle, or that your vehicle will have that condition.  See your GM dealer for information on whether your vehicle may benefit from the information.

WE SUPPORT VOLUNTARY TECHNICIAN CERTIFICATION

# EXHIBIT D



**Bulletin No.:** PIC6055C
**Published date:** 08/18/2017

# Preliminary Information

PIC6055C Integrated Center Stack Display Delaminating Distorted Or Appears Bubbled Behind Lens

## Models

| Brand: | Model: | Model Years: | VIN: from | to | Engine: | Transmissions: |
|--------|--------|--------------|-----------|-----|---------|----------------|
| Cadillac | ATS | 2013 - 2017 | All | All | All | All |
| Cadillac | SRX | 2013 - 2017 | All | All | All | All |
| Cadillac | XTS | 2013 - 2017 | All | All | All | All |
| Cadillac | CTS Vin A | 2014 - 2017 | All | All | All | All |
| Cadillac | ELR | 2014 - 2017 | All | All | All | All |
| Cadillac | Escalade | 2014 - 2017 | All | All | All | All |

## Supersession Statement

This PI was superseded to update the Model Years and Recommendation section. Please discard PIC6055B.

## Condition / Concern

Customers may report their radio screen appears bubbled or is delaminating.

## Recommendations / Instructions

If this concern is encountered, replace the ICS (Integrated Center Stack) by following the SI replacement procedure.

Note: THIS PI ONLY APPLIES TO THE TOUCH SCREEN  (see picture below). If the ICS was damaged by cleaning agents or excessive force do not refer to the information in this PI, please refer to the latest version of bulletin 08-08-44-015.

2013-2017 model years, please contact your ESC and replace the ICS for this concern.

Effective 8/21/2017, for model years 2017 and prior the Cadillac CUE ICS is no longer on GM TAC Restriction.  Please contact your ESC directly.



## Parts Information

Use the latest part number available from your ESC (Electronic Service Center).

## Warranty Information

For vehicles repaired under warranty, use:

| Labor Operation | Description | Labor Time |
|-----------------|-------------|------------|
| 3420700 | Radio Control Assembly Replacement | Use Published Labor Operation Time |

        

© 2016 General Motors. All Rights Reserved.